In re the **LESLIE FAY COMPANIES, INC.** Securities Litigation.

**This Document Relates To: All Actions.**

**No. 92 Civ. 8036 (WCC).**

United States District Court, S.D. New York.

Jan. 3, 1995.

Abbey & Ellis, Chairman of Plaintiffs' Executive Committee, New York City (Arthur N. Abbey, Mark C. Gardy, Stephen J. Fearon, Jr., of counsel).

Milberg Weiss Bershad Hynes & Lerach, Member of Plaintiffs' Executive Committee, New York City (Barry A. Weprin, Jeffrey S. Abraham, of counsel).

Spector & Roseman, P.C., Member of Plaintiffs' Executive Committee, Philadelphia, PA (Robert M. Roseman, of counsel).

Bernstein Litowitz Berger & Grossmann Member of Plaintiffs' Executive Committee, New York City (Daniel Berger, Robert S. Gans, of counsel).

Wolf Popper Ross Wolf & Jones, Member of Plaintiffs' Executive Committee, New York City (Marian P. Rosner, of counsel).

Proskauer Rose Goetz & Mendelsohn, New York City (Leon P. Gold, Mark E. Davidson, David A. Picon, Howard S. Koh, of counsel), for defendant BDO Seidman.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge:

Plaintiffs bring this action on behalf of all individuals who purchased common stock of The Leslie Fay Co., Inc. ("Leslie Fay") between March 28, 1991 and April 5, 1993 (the "Class Period"). The amended complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Before the Court is the motion of defendant BDO Seidman ("BDO") to dismiss pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.Pro. Although not moving for reconsideration of our previous disposition of an identical motion, BDO submits this motion asking us to reevaluate our prior decision in light of the Supreme Court's subsequent pronouncement in *Central Bank of Denver, N.A. v. First Interstate of Denver, N.A.,* ⸺ U.S. ⸺, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and in light of inadequacies in the plaintiffs' fourth amended complaint. For the reasons stated below, we deny BDO's motion.

### I.

Although the facts of this case are thoroughly articulated in our prior opinion, *see In re The Leslie Fay Companies, Inc. Securities Litigation,* 835 F.Supp. 167 (S.D.N.Y. 1993) [hereinafter *Leslie Fay I* ], plaintiffs have since amended their complaint to reflect the findings of a detailed investigation by Leslie Fay's Audit Committee. In light of these new factual allegations, we will briefly summarize the amended complaint to reflect the relevant additions.

Plaintiffs allege that from 1990 through 1992, the officers and directors (the "Individual Defendants") of Leslie Fay, a well-known manufacturer of women's apparel, engaged in a fraudulent scheme designed to deceive the investing public as to its financial viability. Of particular relevance to BDO's participation in the scheme, plaintiffs further allege that to support its public misrepresentations, Leslie Fay altered company financial records in two ways. First, the Company manipulated its books, chiefly the general ledger, to overstate assets and understate liabilities. Leslie Fay utilized these misstatements to conceal shortfalls from divisional budgeted results. Second, Leslie Fay further altered its books and records by, among other things, manipulating inventory counts, classifications and costs; accounts payable; and expenses to substantiate these accounting irregularities. In all, the fraud involved several hundred journal entries, made in more than one hundred different general ledger accounts, occurring over an extended period of time, and involving at least 15 Leslie Fay employees.

The overall scheme led to an overstatement of Leslie Fay's pretax income in the fourth quarter of 1990 through 1992 by a total of over $75 million. Similarly, gross profits were overstated by $3 million (1.1%), $12.4 million (5.1%), and $35.8 million (18.9%), and per-share earnings by $0.15 (10.9%), $0.48 (44.9%), and $1.84 (347.2%) in 1990, 1991, and 1992, respectively.

Leslie Fay retained defendant BDO to provide independent auditing services for the years ending December 29, 1990 and December 28, 1991. BDO issued an unqualified opinion for each of those years (the "Opinions"), which were included in Leslie Fay's 1990 and 1991 Form 10–K reports and 1990 and 1991 Annual Reports to Shareholders, respectively, attesting to the accuracy of Leslie Fay's financial statement schedules and their conformity with Generally Accepted Accounting Principles ("GAAP"). In addition, BDO certified that it performed its audits in accordance with Generally Accepted Auditing Standards ("GAAS"). Based on the pervasiveness of the manipulation described above, plaintiffs allege that BDO either knew or was reckless in not knowing that its unqualified opinions were wholly unfounded. They claim that BDO knew of Leslie Fay's weaknesses in its internal reporting functions, that the company lacked documented accounting and financial policies and procedures, and that it employed practices that were inconsistent with GAAP. Despite bringing several of these deficiencies to Leslie Fay's attention, BDO did not insist that the company implement any reporting changes, submitting that the proposed adjustments were immaterial to the accuracy of the financial statements.

Plaintiffs allege that in reality these deficiencies directly led to and involved the ledger manipulations and rendered BDO's '91 and '92 opinions materially untrue.

On February 1, 1993, Leslie Fay informed the investing public of certain "accounting irregularities" and announced that the Board of Directors' Audit Committee would investigate. This disclosure sent the price of Leslie Fay's common stock spiraling from $12.00 to $7.375 per share. Corporate Controller Donald Kenia admitted that he and 15 other employees had been falsifying invoices. He later claimed that he had come forward because the discrepancies caused by the falsification had become too large to hide. By April 5, 1993, following the Company's disclosure that the SEC was investigating the alleged fraud and the Company's petition for bankruptcy under Chapter 11, the stock had fallen to $2.75 per share. After the overstatements were revealed by the Audit Committee on February 26, 1993, BDO withdrew its 1991 opinion. This suit followed.

## II.

Defendant BDO moves to dismiss plaintiffs' amended complaint against it on three grounds. First, BDO argues that the Supreme Court's literal interpretation of § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") in *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.,* — U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which foreclosed an aiding and abetting cause of action under that section, also barred reliance on mere reckless behavior in satisfying the scienter requirement of a direct liability cause of action under that section. Second, BDO asserts that even apart from *Central Bank,* the fourth amended complaint fails to meet the strictures of Fed.R.Civ.Pro. 9(b), which requires pleading fraud with particularity, by omitting allegations that BDO acted with the requisite intent. Finally, BDO contends that under

*Central Bank's* literal statutory construction, BDO's alleged misstatements, which it contends that Leslie Fay included only in SEC filings not otherwise provided to the investing public, were not promulgated "in connection with the sale or purchase of any security" as required by the statute. Grouping BDO's first and third arguments, we will first consider the impact of *Central Bank* on the direct liability scienter and "in connection with" aspects of a § 10(b) private cause of action. Second, we will address BDO's argument that even apart from *Central Bank* we misapplied the scienter standard in *Leslie Fay I* in holding that the complaint satisfied the constraints of Fed.R.Civ.Pro. 9(b).

### A. The *Central Bank* Case

In March, 1994, the Supreme Court held in a landmark decision that the language of § 10(b) of the 1934 Act, codified at 15 U.S.C. § 78j (1988),[1] did not support a cause of action for aiding and abetting securities fraud prohibited by that section and Rule 10b–5 promulgated thereunder. *Central Bank,* — U.S. at ——, 114 S.Ct. at 1448. This decision effectively abrogated 25 years of recognition of the aiding and abetting doctrine, not to mention overruling the prior holdings of all eleven courts of appeals that have considered such a claim. *See Cleary v. Perfectune, Inc.,* 700 F.2d 774, 777 (1st Cir. 1983); *IIT, As International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799, 800 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Schatz v. Rosenberg,* 943 F.2d 485, 495–96 (4th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); *Fine v. American Solar King Corp.,* 919 F.2d 290, 300 (5th Cir.1990), *cert. dismissed,* 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991); *Moore v. Fenex, Inc.,* 809 F.2d 297, 303 (6th Cir.), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97

---

1. That section reads:

§ 78j. **Manipulative and deceptive devices**
 It shall be unlawful for any person, directly or indirectly ...
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security

not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

L.Ed.2d 737 (1987); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946–47 (7th Cir.1989); *K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 977 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991); *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir.1992); *Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir.1988), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989). Although commentators had questioned its viability after the Supreme Court narrowed the scope of prohibited conduct in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *see* Donald R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Calif.L.Rev. 80, 82 (1981), the bulk of the controversy surrounding the aiding and abetting doctrine centered on its scope and not its existence. Indeed in *Central Bank* itself, the petitioner had merely sought review as to whether the doctrine was applicable to indentured trustees and whether reckless behavior was sufficient to trigger liability under the doctrine. The Supreme Court, however, after granting certiorari, specifically requested that the parties address the claim's statutory basis.

In *Central Bank*, investors brought suit against Colorado Springs Stetson Hills Public Building Authority, which issued $26 million in bonds in 1986 and 1988 to finance improvements at Stetson Hills; Central Bank of Denver, which served as indenture trustee for the bond issues; the property developer AmWest Development; the 1988 underwriter; and a junior underwriter. The plaintiffs claimed that Central Bank aided and abetted the other defendants in not complying with one of the bonds' covenants, an alleged violation of § 10(b). The district court, finding reckless conduct insufficient to support an aiding and abetting claim, dismissed the complaint against Central Bank. The Tenth Circuit reversed. Sidestepping the scienter issues raised below altogether, the Supreme Court held that § 10(b) does not support a private cause of action for aiding and abetting securities fraud. The Court reasoned that since its prior holdings dictated that the statutory language itself governs the scope of conduct prohibited by § 10(b), and since the language of § 10(b) does not specifically prohibit aiding and abetting securities fraud, plaintiffs could not maintain an action based on that theory. In addition, the Court held that even apart from the language itself, the fact that Congress could have, but did not, provide for an aiding and abetting cause of action in the 1934 Act's express remedies provisions indicated that Congress did not intend to prohibit such conduct, especially not through a judicially implied remedy. Hinting at an alternative possibility, however, the Court did note that an "aider and abettor" might still be liable for primary violations of § 10(b) if its conduct satisfies all of the statute's elements. *Central Bank*, —— U.S. ——, 114 S.Ct. at 1455.

### B. *Central Bank* and Scienter

■ At the outset, as BDO implicitly concedes, *Central Bank* does not expressly hold that recklessness cannot form the basis of primary liability under § 10(b).[2] Indeed, much to the chagrin of many commentators seeking clarity in securities law, *see, e.g.*, Scott A. Crist, *Walking on Thin Ice: The Changing Liability of Attorneys in the Securities Arena*, 27 J.Marshall L.Rev. 909, 917 (1994), the Court has again refused to address an issue that it reserved over eighteen years ago in *Hochfelder*, 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12 ("We need not address here the question of whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."). Unfortunately, therefore, the

---

**2.** In rejecting the SEC's argument that the criminal aiding and abetting statute, 18 U.S.C. § 2, was the predicate for an implied civil aiding and abetting claim under section 10(b), the Court noted that liability under that statute must be based on intentional conduct, rather than recklessness. Although the Court's dicta may imply that the SEC can only pursue civil aiding and abetting claims based on intentional conduct, it does not rely on an interpretation of § 10(b)'s "manipulative or deceptive" language to do so. Therefore, this statement by itself does not indicate the Court's rejection of recklessness as a basis for primary liability.

Supreme Court in *Central Bank* does little to crystalize the amorphous status of scienter in § 10(b) civil litigation. *See Leslie Fay I*, 835 F.Supp. at 172 & n. 1.

On the other hand, the Second Circuit has specifically addressed the scienter issue. As Judge Wood recounted in *In re Fischbach Corporation Securities Litigation*, No. 89 Civ. 5826 (KMW), 1992 WL 8715, at *2 (S.D.N.Y. Jan. 15), prior to the Supreme Court's rejection of negligent (as opposed to reckless or intentional) conduct as a basis for securities fraud in *Hochfelder*, the Second Circuit held that "proof of wilful or reckless disregard for the truth is necessary to establish liability under Rule 10b–5." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 (2d Cir. 1973) (en banc). Then, in *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), the court stated that *"Hochfelder* left intact our rule that recklessness is a form of scienter in appropriate circumstances." *Id.* at 46. Since that time, the court has repeatedly held that recklessness, at least in some form, may support a claim of fraud under § 10(b). Possibly most important, however, even after *Central Bank* the court in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir.1994), indicated that allegations of "facts that constitute strong circumstantial evidence of conscious misbehavior *or recklessness"* may be sufficient to overcome a motion to dismiss. *Id.* at 1128 (emphasis added).

Notwithstanding *Shields'* endorsement of the recklessness standard, at different times since *Hochfelder*, the Second Circuit has approached § 10(b) scienter in at least three distinct ways.[3] First, consistent with the *Shields* holding, the *Lanza* line of cases indicates that unqualified allegations of recklessness are sufficient to satisfy the scienter requirement of § 10(b) and Rule 10b–5. *See, e.g., In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 268–69 (2d Cir.1993), *cert. denied sub nom., Ross v. ZVI Trading Corp.,* — U.S. —, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994) ("We have recognized two distinct ways in which a plaintiff may plead scienter without direct knowledge of the defendant's state of mind. . . . The second approach is to allege facts constituting circumstantial evidence of either recklessness or conscious behavior."); *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir.1991) (" '[A]llegations of scienter are sufficient if supported by facts giving rise to a 'strong inference' of fraudulent intent.' For Rule 10(b)(5) [sic] purposes, scienter includes recklessness." (citations omitted)); *Oleck v. Fischer*, 623 F.2d 791, 794 (2d Cir.1980) ("[T]o establish liability after *Hochfelder*, . . . this court has adhered to the proposition earlier announced in *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 (2d Cir.1973) (en banc) that 'reckless conduct will generally satisfy the *scienter* requirement.' ").

In the *Rolf* line of cases that developed under the now defunct aiding and abetting theory, the court allowed allegations of recklessness to satisfy the scienter requirement only if the aider and abettor had a fiduciary relationship with the plaintiff. Absent such a relationship, the requisite level of intent was proportional to the remoteness of the actor from the fraudulent transaction. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir.1982), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1992) (This court has held that proof of reckless conduct meets the requirement of scienter in a section 10(b) claim. . . . For the imposition of aider and abettor liability under section 10(b), however, we have held that recklessness satisfies the scienter requirement where 'the alleged aider and abettor owes a fiduciary duty to the defrauded party.' (citations omitted)); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir.1982) ("Assuming for the argument that recklessness on the part of a non-fiduciary accountant will satisfy *Ernst & Ernst's* requirement of scienter, such recklessness must be conduct that is 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care.' It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." (citations omitted)); *IIT, An International Investment Trust v. Corn-*

---

**3.** For convenience we refer to the first approach as the *Lanza* line of cases, the second as the *Rolf* line of cases, and the third as the *Wechsler* line of cases.

*feld,* 619 F.2d 909, 923 (2d Cir.1980) ("[R]eckless conduct will generally satisfy the *scienter* requirement. However, ... in applying this general principle to aiders and abettors ... '[t]he *scienter* requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing.'" (citations omitted)); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.1978) ("[A]t least where, as here, the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement." (note omitted)).

Finally, in the *Wechsler* line of cases the court has indicated that § 10(b) scienter requires either allegations of actual intent or circumstances implying a strong inference of actual intent. *See Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir.1991) ("With regard to his claims under § 10(b) and Rule 10b–5, Healey was also required to prove defendants' scienter ... or such recklessness to amount to scienter...." (citations omitted)); *Mayer v. Oil Filed Systems Corp.,* 803 F.2d 749, 756 (2d Cir.1986) ("Scienter requires at least knowing misconduct, which may, of course, be proven as a matter of inference from circumstantial evidence."); *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984) ("To prove scienter in a § 10(b) case, a plaintiff must demonstrate 'knowing or intentional misconduct' on the part of the defendant, ... or an 'intent to deceive, manipulate, or defraud' investors. Proof of scienter need not be direct, but may be 'a matter of inference from circumstantial evidence.'" (citations omitted)); *cf. Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993) ("Scienter may be inferred by finding that the defendant knew or reasonably believed that the securities were unsuited to the investor's needs, misrepresented or failed to disclose the unsuitability of the securities, and proceeded to recommend or purchase the securities anyway."); *Reiss v. Pan American World Airways, Inc.,* 711 F.2d 11, 14 (2d Cir.1983) ("To prove *scienter* ... there must be proof that the non-disclosure was intended to mislead.").

Possibly due to the wide variety of factual situations that may give rise to a securities fraud action, the Second Circuit's treatment of the scienter requirement is far from uniform. Moreover, the extent to which factual claims support allegations of scienter likewise eludes precise articulation. Faced with such incongruity, in our prior opinion assessing the plaintiffs' allegations of scienter we adopted the reasoning of the *Wechsler* line of cases as articulated in *In re Fischbach,*[4] holding that at least as to outside auditors, "[Rule] 10b–5 proscribes only behavior which is either deliberate or so reckless that an inference of fraudulent intent might be drawn by a reasonable finder of fact." *Leslie Fay I,* 835 F.Supp. at 173. Although we noted that the complaint failed to allege facts indicating that BDO acted deliberately, we found that the plaintiffs alleged sufficient reckless conduct from which a fact finder might reasonably infer fraudulent intent. We did not, however, hold that mere allegations of recklessness were sufficient to satisfy the scienter requirement.

In this motion, BDO does not argue that the Second Circuit has rejected a scienter standard encompassing some form of reckless conduct. Nor does it maintain that we erroneously interpreted Second Circuit law in adopting the scienter standard articulated in the *Wechsler* cases. Instead, it asserts that the Supreme Court's adherence to strict statutory interpretation in rejecting aiding and abetting liability also requires a rejection of recklessness as a basis for establishing "manipulative or deceptive" conduct, overruling any Second Circuit precedent to the contrary. Citing *Hochfelder,* BDO contends that § 10(b) precludes only "knowing or intentional misconduct." *Hochfelder,* 425 U.S. at 197–98, 96 S.Ct. at 1383. Since reckless conduct is not by itself "knowing or intentional," BDO argues that the strict reading of

---

**4.** *In re Fischbach,* Judge Wood attempted to reconcile the *Lanza* and *Wechsler* type cases by arguing that the recklessness referred to in the former line of cases is intentional recklessness or willful blindness. *Id.* at *5. Noting that under tort law and criminal law deliberately protected ignorance is a form of intentional conduct, the court held that a plaintiff could properly plead scienter only by alleging that the defendant exhibited such extreme recklessness that a fact finder could infer actual intent or that the defendant was willfully blind to its actions.

§ 10(b) called for in *Central Bank* precludes reliance on reckless conduct in establishing liability. In addition, BDO argues that because the distinction between negligent and reckless conduct is so arbitrary, we should reject reliance on recklessness as a basis for liability altogether. *Cf. Central Bank,* —— U.S. at ——, 114 S.Ct. at 1454 (lamenting the ad hoc nature of aiding and abetting liability).

At first blush, it seems BDO has misunderstood our previous ruling in *Leslie Fay I.* As noted above, our prior decision upholding plaintiffs' claims against BDO was not based on allegations in the complaint that supported a finding of recklessness. We held that plaintiffs alleged sufficient reckless conduct from which a reasonable fact finder could infer fraudulent intent. In light of this ruling, BDO's contentions can be read in either one of two ways.

First, BDO might be arguing that *Central Bank* prevents relying solely on allegations supporting an inference of recklessness to sustain a § 10(b) cause of action—effectively overruling the *Lanza* line of cases. However, since *Leslie Fay I* and Part III of this opinion do not rest on naked allegations of recklessness, but instead on allegations sufficient to support an inference of intent, we have no occasion to address this contention.[5] Whether or not *Central Bank* precludes maintaining a § 10(b) action based solely on reckless conduct, our prior ruling would be unaffected.

On the other hand, BDO might be arguing that *Central Bank* also precludes inferring actual intent from reckless conduct—overruling the *Wechsler* line of cases. While such a reading might indeed undermine our previ-

ous opinion and Part III herein, we find it untenable. Even granting BDO's broad interpretation of *Central Bank,* the Court's strict statutory construction approach and criticism of ad hoc liability standards implicit in aiding and abetting claims does not affect our prior holding in this case for the following reasons.

First, in a securities action, as in any other case, a plaintiff may establish a defendant's intent by either direct or circumstantial evidence. *See United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). Therefore, plaintiffs' allegations of reckless conduct, which we previously held provide sufficient circumstantial evidence of intent, satisfy even BDO's contention that *Central Bank* requires pleading actual intent. *In re Columbia Securities Litigation,* 155 F.R.D. 466, 479 (S.D.N.Y.1994); *Enzo Biochem Inc. v. Johnson & Johnson,* No. 87–6125 (KMW), 1992 WL 309613, at *11 (S.D.N.Y. Oct. 15, 1992); *Cosmas v. Hassett,* 886 F.2d 8, 12–13 (2d Cir.1989). On a motion to dismiss, a court must read the complaint generously, and draw all reasonable inferences in favor of the pleader. *Id.* at 11.

Second, although what constitutes sufficient recklessness from which a jury can infer intent may often be an "ad hoc" determination, judges are forced to wrestle with these types of questions every time a defendant makes a motion for judgment as a matter of law. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (drawing all reasonable inferences against the moving party). While in a perfect world liability would be color-coded in black and white, shades of gray are

---

5. Interestingly, although with no indication that the court specifically considered *Central Bank's* implications, the Second Circuit did reaffirm recklessness as the appropriate standard of scienter after the Supreme Court issued its decision. *Shields,* 25 F.3d at 1128. Moreover, *Central Bank* is not the first case to emphasize reliance on the statutory language in evaluating the scope of conduct prohibited by § 10(b). *See Hochfelder,* 425 U.S. at 197–98, 96 S.Ct. at 1383. The Second Circuit has repeatedly upheld a recklessness standard since *Hochfelder,* however. *See, e.g., Oleck,* 623 F.2d at 794 ( [T]o establish liability after *Hochfelder,* ... this court has ad-

hered to the proposition earlier announced in *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir.1973) (en banc) that "reckless conduct will generally satisfy the *scienter* requirement."). BDO fails to point out how *Central Bank's* strict constructionism altered the statutory analysis dictated by *Hochfelder* and under which the Second Circuit adopted a recklessness standard. In fact, BDO apparently asserts that *Hochfelder's* statutory approach also dictates rejection of a recklessness standard. *Defendants' Mem. in Support,* at 18. The Second Circuit has rejected such an argument. *See Oleck,* 623 F.2d at 794.

an inherent incident of our legal system. Moreover, to hold that *Central Bank* forecloses a jury's traditional province of drawing reasonable inferences from the facts by dismissing inferentially based claims at the pleading stage would be a radical departure from centuries of jurisprudence. Indeed, such a holding would put a higher standard on securities plaintiffs at the pleading stage than on a motion for summary judgment, where all reasonable inferences are drawn against the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Whether or not *Central Bank* has affected the scienter standard of § 10(b), we are not prepared to conclude it has changed the fact finder's traditional role in securities cases. We merely reiterate the unremarkable tenet of our judicial system that juries are entitled to draw reasonable inferences from the facts and that judges must protect that right at the pleading stage. *See Cosmas*, 886 F.2d at 11.[6] Therefore, we hold that *Central Bank* does not affect the scienter standard we adopted in *Leslie Fay I*.

## C. *Central Bank* and "In Connection With"

■ Next, BDO argues that *Central Bank* also demands a reexamination of the Second Circuit's interpretation of the "in connection with" requirement of § 10(b). BDO contends that since its false statements were contained only in SEC filings not readily available to the investing public,[7] they were

not made in connection with the purchase or sale of any securities.

The Second Circuit in *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953 (2d Cir.1993) construed the "in connection with" requirement broadly to include all "dissemination[s] into the marketplace of false or misleading information." *Id.* at 962. The court based its reading in part on the Supreme Court's admonition in *Superintendent of Insurance the State of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), that "[s]ection 10(b) must be read flexibly, not technically and restrictively." Analyzing Second Circuit law since *Superintendent of Insurance*, and in light of the Supreme Court's endorsement of fraud-on-the-market theory in *Basic v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988), the court reasoned:

> Because the fraud on the market may taint each purchase of the affected stock, each purchaser who is thereby defrauded . . . is defrauded by reason of the publicly disseminated statement. If such a straightforward cause and effect is not a connection, then [Rule 10b–5] would not punish a particularly effective means of reducing the integrity of, and public confidence in, the securities markets. The 'in connection with' language was chosen in an effort to broaden the reach of the Rule to achieve precisely these aims, *see, e.g., SEC v. Texas Gulf Sulphur*, 401 F.2d [833] at 860–62 [ (2d Cir.1986) ]; it should not be used to

**6.** Fed.R.Civ.Pro. 9(b) also supports our decision. That rule provides that, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *Goldman v. Blenden*, 754 F.2d 1059, 1070 (2d Cir.1985) ("Thus, great specificity was not required with respect to the allegations of knowledge and scienter. . . ."). Alleging facts raising a reasonable inference of intent meets that standard.

**7.** While BDO notes that plaintiffs allege that Leslie Fay announced a secondary offering of its stock in 1991, it points out that the complaint fails to allege that BDO consented to the inclusion of its 1990 audit report in either the registration statement or any prospectuses distributed incident to the offering. Plaintiffs submit that as a prerequisite to inclusion BDO must have consented. *See* 15 U.S.C. § 77g(a). Notably, the

complaint also fails to allege that BDO's financial certifications were included in the registration statement and prospectuses. BDO points out, however, that the law requires their inclusion. 15 U.S.C. § 77g.

Since none of these allegations are contained in the complaint, we decline to base our decision on them. We recognize that the court has the power to consider SEC-filed documents on a motion to dismiss, *see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991); however, these documents were never proffered to the court for consideration. Moreover, because we find that BDO's allegedly false statements contained in Form 10–Ks and annual reports were made in connection with the purchase or sale of securities, we have no occasion to consider these extraneous allegations on this motion.

defeat them.[8]

*Ames,* 991 F.2d at 967–68.

Based solely on this broad reading of the requirement, we would have little trouble in holding that BDO's misleading financial statements contained in Form 10–K filings and company annual reports were made "in connection with" the sale or purchase of securities. According to the amended complaint, BDO's certifications of Leslie Fay's alleged false financial statements directly affected the market price of Leslie Fay stock. Under *Ames,* such allegations satisfy the "in connection with" requirement. However, BDO argues that *Central Bank* has abrogated such a loose interpretation of the statute and that the Seventh Circuit's analysis in *Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183 (7th Cir.1993), while predating *Central Bank,* correctly characterizes the phrase's proper connotation. We are not persuaded.

*Central Bank* mandates that in assessing the scope of conduct prohibited by § 10(b), we must first look to the language of the statute. *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1446. Although the statute makes no reference to aiding and abetting liability, it does prohibit using or employing manipulative or deceptive devices *in connection with* the purchase or sale of any security. While BDO apparently asserts that this phrase has an unambiguous meaning, courts and commentators do not share in its view. *See* Barbara Black, *Commentary: The Second Circuit's Approach to the 'In Connection With' Requirement of Rule 10b–5',* 53 Brook. L.Rev. 539, 540 (1987) ("[W]hat 'in connection with' requires remains a source of uncertainty."). For instance, as BDO argues, in one sense the statute seems to proscribe only fraud acting as a catalyst in a specific purchase or sale of a security. On the other hand, as Justice Douglas arguably indicated, the phrase should be interpreted to encompass any fraud that "touches" the purchase or sale of securities, whether or not directly associated with the transaction in question. *Superintendent of Insurance,* 404 U.S. at 12–13, 92 S.Ct. at 169.[9] Recognizing the ambiguity of this "touch" test, still others assert that the phase's meaning can be fleshed out only on a case by case approach. *See Natowitz on Behalf of Lexington/56th Associates v. Mehlman,* 567 F.Supp. 942, 946 (S.D.N.Y.1983). Judge Friendly possibly best characterized the phrase's ambiguity by noting that, "the 'in connection with' phrase 'is not the least difficult aspect of the 10b–5 complex to tie down.'" *Chemical Bank v. Arthur Anderson & Co.,* 726 F.2d 930, 942 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) (quoting Loss, Fundamentals of Securities Regulation 903 (1983)).

Interestingly, BDO itself never offers a precise definition of the phrase. It merely argues that the requirement was not meant to encompass non-public filings with the SEC. However, the complaint alleges BDO's opinion was also included Leslie Fay's 1990 and 1991 Annual Reports. In light of the historical ambiguity surrounding the phrase, and the fact that plaintiffs allege that BDO's misstatements were included in annual reports distributed to shareholders in addition to 10–K filings, we are not prepared to hold that the statute, on its face, unambiguously forecloses liability in this situation. Nor does *Central Bank* compel such a holding. Unlike the phrase "manipulative or deceptive device," which clearly suggests scienter, *see Hochfelder,* 425 U.S. at 197, 96 S.Ct. at 1383, and the complete absence of language prohibiting the aiding and abetting of securities fraud, the "in connection with" phrase by itself does not indicate a Congressional intent to foreclose liability for falsely indicating a

---

**8.** It has been suggested that in this opinion the Second Circuit confuses causation and "in connection with." *See* C. Edward Fletcher, III, The "in Connection With" Requirement of Rule 10b–5, 16 Pepp.L.Rev. 913 (1989). The causation requirement (sometimes labeled "loss causation") requires the fraud to have caused the plaintiffs harm. On the other hand, "in connection with" merely requires some nexus between the fraud and the purchase or sale of securities.

Nevertheless, we agree with the court's reasoning in adopting a broad "in connection with" interpretation.

**9.** Some have questioned this interpretation of Justice Douglas's use of the word "touching." *See* Louis Loss, Fundamentals of Securities Regulation 791 (1988).

company's financial viability, and thereby directly affecting the price of the company's stock. Such a determination could come only from a more probing analysis of the statute.

Given the statute's inherent ambiguity, *Central Bank* requires us to examine the historical and legislative context of § 10(b) to uncover its probable legislative meaning. *Central Bank*, —— U.S. at ——, 114 S.Ct. at 1448 ("When the text of § 10(b) does not resolve a particular issue, we attempt to infer how the 1934 Congress would have addressed the issue had the 10b–5 action been included as an express provision in the 1934 Act." (citation omitted)). Since that is precisely the process the Second Circuit utilized in *Ames Department Stores* to develop its broad interpretation, we do not think *Central Bank* compels a different result. Nevertheless, we will address each of BDO's contentions.

BDO refers to the language of provisions of the Securities Act of 1933 (the "1933 Act") as evidence of Congressional intent to attach a narrow reading to the "in connection with" requirement. For instance, § 7 of the 1933 Act requires an accountant's consent to use its statements "in connection with" a registration statement. 15 U.S.C. § 77g. Section 11(a)(4) allows private suits against accountants only for misstatements made "in connection with" a registration statement. 15 U.S.C. § 77k(a)(4). Finally, while not using the phrase "in connection with," § 12 of the 1933 Act places liability only on "offerors or sellers" who violate that section. 15 U.S.C. § 77l. Since the "in connection with" requirements in §§ 7 and 11 both refer to a direct link between the auditor's report and a selling document, and the Supreme Court has interpreted § 12 to apply only to persons actually soliciting the purchase of a security, *see Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 2078, 100 L.Ed.2d 658 (1988), BDO argues that a similar narrow interpretation applies to § 10(b)'s use of the "in connection with" phrase.

BDO's reasoning fails to acknowledge a fundamental difference between the 1933 and 1934 Acts. While the 1933 Act primarily regulates initial distributions of securities, the 1934 Act governs post-distribution trad-

ing. *Central Bank*, —— U.S. ——, 114 S.Ct. at 1445. More specifically, as Judge Friendly stated:

> [t]he purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Chemical Bank*, 726 F.2d at 943. Similarly, the court stated in *SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 860 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) that:

> [t]here is no indication that Congress intended that corporations or persons responsible for the issuance of a misleading statement would not violate the section unless they engaged in related securities transactions or otherwise acted with wrongful motives; indeed, the obvious purposes of the Act to protect the investing public and to secure fair dealing in the securities markets would be seriously undermined by applying such a gloss onto the legislative language.

Acknowledging this broad remedial purpose, and hence the endless variety of factual situations that § 10(b) was meant to address, the Supreme Court has admonished that courts should read § 10(b) and Rule 10b–5 "flexibly, not technically and restrictively." *Superintendent of Insurance*, 404 U.S. at 12, 92 S.Ct. at 169. *Central Bank* did not alter this fundamental tenet.

*Central Bank* merely held that courts should not expand a § 10(b) implied cause of action to reach conduct completely outside its textual authority, especially when Congress could have, but did not, include such actions in analogous express remedy provisions. That does not mean that courts should not flexibly read the text itself to cover conduct within § 10(b)'s textually supported purposes, however. Absent such flexibility, § 10(b) could not address the realities of today's complicated securities markets. That cannot be what Congress intended.

Indeed, although admittedly before *Central Bank* was decided, the *Ames* court rejected the argument that the 1933 Act demands a narrow reading of the § 10(b) "in connection with" requirement. *Ames Department Stores*, 991 F.2d at 962. Furthermore, in recognizing the fraud-on-the-market theory, the Supreme Court implicitly adopted an expansive reading of "in connection with." *Basic*, 485 U.S. at 247, 108 S.Ct. at 992. Although specifically addressing only the reliance and materiality requirements, the Court's holding subsumes the proposition that at least some deceptive practices directly affecting open market trading are actionable under § 10(b). In light of *Superintendent of Insurance, Texas Gulf Sulphur*, and *Chemical Bank*, we find still viable the *Ames* holding that "frauds which affect the integrity of the securities markets fall well within [§ 10(b) and Rule 10b–5]." *Ames*, 991 F.2d at 966.[10] *Central Bank* does not alter our analysis.

Finally, BDO asks us to adopt the rule articulated in *Frymire–Brinati* which states that for an outside auditor to be liable for primary violations of § 10(b), it must have known of and consented to the use of its financial certifications in soliciting the purchase of securities. *Frymire–Brinati*, 2 F.3d at 190. Propounding that *Frymire–Brinati* articulates the narrow reading of "in connection with" that it claims *Central Bank* mandates, BDO argues that since its financial audits were not conducted for the specific purpose of use by Leslie Fay in soliciting stock purchases, the audits were not prepared in connection with the purchase or sale of securities.

BDO misreads the import of *Frymire–Brinati*. In that case, the plaintiffs had purchased an interest in a series of limited partnerships investing in particular properties. In 1984, the general partner, Pepco, issued to plaintiff $1 million in preferred stock supposedly to facilitate a merger by increasing the company's liquidity. Soon after, Pepco collapsed and the plaintiffs, out $1 million in addition to their limited partnership investments, sued the accounting firm that had audited Pepco in 1983. Judge Easterbrook held that the audit report was not issued in connection with the sale of the limited partnerships or the preferred stock since the auditing firm had no reason to know its report would be utilized to sell securities.

*Frymire–Brinati* merely reiterates the principle articulated by Judge Friendly in *Chemical Bank* that "in connection with" means that the fraud must have some direct pertinence to a securities transaction. *See Frymire–Brinati*, 2 F.3d at 189 (citing *Chemical Bank*). Judge Easterbrook articulates this principle by using a "reason to know" test. However, this standard is not at all inconsistent with the *Ames* holding that public dissemination of misleading statements in highly developed, efficient markets are made "in connection with" the sale or purchase of securities. As plaintiffs point out, *Mem. in Opp.* at 19 n. 6, the auditor's alleged false statements in *Frymire–Brinati* had no relation to the sale of limited partnership shares. The report covered only the general partner corporation, not the limited partnerships themselves. Similarly, as BDO highlights, the court held that the auditing firm had no reason to know its opinion would be used to solicit purchases of Pepco preferred stock issued in a private transaction months after the auditor issued its report. Although hinting that the auditing firm should know its results would be distributed to shareholders, the court held that it did not know they would be used by management to solicit the purchase of unregistered securities. Hence the report was not issued "in connection with" the sale. *Frymire–Brinati*, 2 F.3d at 189–90.

---

**10.** In reaching this conclusion, we do not ignore Judge Friendly's statement in *Chemical Bank* that actionable fraud must relate to the securities transaction to satisfy the "in connection with" requirement. *Chemical Bank*, 726 F.2d at 943; *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 847 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986) (misrepresentations must have some direct pertinence to a securities transaction). Certainly, cases of corporate mismanagement or fraudulent accounting which are tenuously tied to the securities market are not actionable under § 10(b). We merely hold that on the basis of plaintiffs' amended complaint, BDO's alleged misstatements meet the "in connection with" requirement under Second Circuit and Supreme Court precedent.

Unlike *Frymire–Brinati*, the present case, like *Ames*, concerns the securities transactions which took place on a highly developed, arguably efficient secondary market. Here, plaintiffs allege BDO's audit reports were used in a scheme specifically designed to defraud the investing public. Accepting the amended complaint as true, BDO clearly knew their certifications would be included in Form 10–Ks and annual reports. Holding that BDO had no reason to know investors would utilize these documents in selling and purchasing Leslie Fay stock would ignore the realities of large corporation secondary-market stock trading. In *Frymire–Brinati* at the time the auditing firm issued its report, the securities were not in existence and nothing indicated to the firm that Pepco was contemplating an offering in the future. By contrast, in the present case, Leslie Fay had over 19 million shares outstanding when BDO performed its audit. Even if BDO had no reason to know that Leslie Fay would use its opinions to issue new securities, which is doubtful,[11] they clearly should have known investors in the secondary markets would rely on their certifications. Whether under the *Frymire–Brinati* "reason to know" standard or *Chemical Bank* "direct relationship" test, we conclude that BDO's opinions satisfy the "in connection with" requirement.

Finally, applying BDO's construction to these facts would effectively sanction a "don't-ask-don't-tell" loophole for auditing firms. In reality, however, auditors of publicly held corporations should contemplate distribution of their reports to the general public, who will, regardless of this Court's actions, make investment decisions accordingly. BDO's interpretation would shield firms from liability absent affirmative representations from the company of their intent to publish the report. We agree that there might be some situations, such as in *Frymire–Brinati* and *Chemical Bank*, in which an auditor's certification is so far removed from a securities transaction that it cannot be deemed to have been issued in connection with the purchase or sale of securities absent such representations. This is not such a case, however. Without adopting a general

rule that audits of companies whose stock is widely held always meet the "in connection with" requirement, we hold that, on the facts of this case, BDO's certifications, which allegedly had a direct effect on the market for Leslie Fay stock, were made in connection with the purchase or sale of securities.

### III.

Finally, although this is not a motion to reconsider our prior opinion, BDO asserts that in our previous disposition we wrongfully applied the holding of *In re Fischbach* to the facts of this case in ruling that the complaint satisfied the scienter requirement of § 10(b). BDO essentially makes four arguments: 1) plaintiffs' theory that BDO ignored "red flags" is inconsistent with an inference that it knew of the fraud; 2) our prior opinion failed to consider the possibility that BDO was also deceived; 3) plaintiffs' assertions of profit motive are insufficient to support an inference of intent; and 4) the fraud was not massive enough to support a reasonable inference of intent. Without reiterating the reasoning of our prior opinion, we will briefly consider each of these arguments.

At the outset, we want to reemphasize the posture of this case. Before the Court is a motion to dismiss under Rules 9(b) and 12(b)(6). Therefore, no matter how artfully BDO asserts that the amended complaint fails to support a finding of intent, we are required to draw all reasonable inferences in favor of the pleader. *Cosmas*, 886 F.2d at 11. A jury might draw many reasonable inferences from the allegations of the present complaint. As BDO asserts, one might reasonably infer that BDO failed to discover the fraud because management concealed the fraud from the auditing firm. On the other hand, as we previously held, a juror might just as reasonably infer that BDO participated in the fraud. Therefore, while BDO is correct that our analysis missed "the possibility that if there was a massive fraud, the auditors were also deceived," *Defendant's Mem. in Support*, at 27, such a consideration would not alter our prior holding. Whether or not BDO will ultimately succeed in convincing a jury it was "also deceived," we

---

**11.** *See supra* note 7.

merely hold that based solely on the allegations in the amended complaint, a reasonable juror could infer BDO engaged in manipulative or deceptive conduct.

■ Applying these principles to each of BDO's arguments demonstrates their misdirection. As to BDO's first argument, while BDO's ignorance of warning signs might in one sense demonstrate it was merely negligent, allegations that, with gross recklessness, BDO ignored multiple "red flags" could reasonably support an inference that BDO acted with intent. Because BDO was immersed in Leslie Fay's operations while performing its audit, and because the "red flags" would be clearly evident to any auditor performing its duties, one could reasonably conclude that BDO must have noticed the "red flags," but deliberately chose to disregard them to avoid antagonizing Leslie Fay and incidentally frustrating its fraudulent scheme.[12] Plaintiffs may have a long road ahead to substantiate their allegations, but the allegations themselves reasonably support such an inference.[13] BDO's second argument fails for the same reason. We agree that the amended complaint could also reasonably support the inference that BDO was deceived along with the investing public, but we must draw all inferences in favor of the pleader, not BDO.

■ As to its third argument, that BDO's profit motive was insufficient to support an inference of fraudulent intent, BDO fails to consider the amended complaint as a whole. We agree with BDO that standing alone BDO's long and profitable relationship with Leslie Fay is an insufficient basis for inferring such intent. However, a fact finder can infer intent from motive and opportunity, gross recklessness, or a combination of the two. *See In re Time Warner,* 9 F.3d at 268–69. Given our duty to read the complaint as a whole, we stand by our previous holding that BDO's relationship to Leslie Fay in conjunction with the allegations of recklessness supply a sufficient basis for inferring the necessary intent.

Finally, BDO's fourth argument asks us to usurp the jury's function in evaluating the allegations in the amended complaint. Whether BDO ultimately succeeds in convincing a jury that the fraud was not massive enough to support an inference of intentional involvement in the scheme, the allegations in the amended complaint clearly demonstrate the pervasiveness of the fraud. At the pleading stage we are forced to rule on the sufficiency of the amended complaint, not on BDO's characterization of its allegations. We think that reading the amended complaint as a whole and drawing all reasonable inferences in plaintiffs' favor supports a reasonable inference that the fraud was massively systemic.

### IV.

Because we find that the amended complaint sufficiently alleges that BDO intentionally participated in the alleged fraud, that BDO issued its auditing reports in connection with the purchase or sale of securities, and that the Supreme Court's pronouncements in *Central Bank* do not change our analysis under Second Circuit law, we deny BDO's motion to dismiss.

BDO asks us to certify the question regarding the effect of *Central Bank* on the scienter requirements of § 10(b) to the Second Circuit, allowing BDO to appeal our ruling immediately. Under 28 U.S.C. § 1292(b):

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling ques-

---

12. BDO argues that plaintiffs' amended complaint fails to allege the "willful blindness" required by *In re Fischbach. See supra* note 4. In that case, Judge Wood held in essence that a § 10(b) plaintiff must plead either conduct giving rise to an inference of actual intent *or* a "willful blindness" demonstrated by intentional recklessness. *In re Fischbach,* at *2–*7. We previously held that the allegations of the amended complaint gave rise to an inference of intent, *Leslie*

*Fay I,* 835 F.Supp. at 173, therefore we need not address whether plaintiffs complaint also supplies a factual basis for substantiating a "willful blindness" claim.

13. This is especially true in light of Rule 9(b) which allows a plaintiff to aver generally a defendant's state of mind. *See Goldman,* 754 F.2d at 1070.

tion of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Since the impact of *Central Bank* on allegations of reckless conduct under a § 10(b) cause of action is immaterial in this case—because we base our holding on an inference of actual intent—we do not think an interlocutory appeal would materially advance the ultimate termination of this litigation. Therefore, we deny BDO's request for certification to the Second Circuit.

So Ordered.