**In re the LESLIE FAY COMPANIES, INC. SECURITIES LITIGATION.**

**This Document Relates To All Actions.**

**No. 92 Civ. 8036 (WCC).**

United States District Court,
S.D. New York.

March 5, 1996.

Parker Chapin Flattau & Klimpl, New York City (Mark Abramowitz, Joel A. Chernov, Jaime L. Katcher, of counsel), for Defendants John J. Pomerantz, Laura H. Pomerantz and Alan Golub.

Parker Chapin Flattau & Klimpl, New York City (Mark Abramowitz, Joel A. Chernov, Jaime L. Katcher, of counsel), for Third–Party Defendants Arthur S. Levine, John A. Ward and Gerald P. Zipp.

Cravath, Swaine & Moore, New York City (Rory O. Millson, of counsel), for Third–Party Defendants Steven M. Friedman, Jack Nash, Lester Pollack and Odyssey Partners, L.P.

Law Offices of Michael G. Berger, New York City (Michael G. Berger, of counsel), for Defendant Paul F. Polishan.

Dechert Price & Rhoads, New York City (Thomas F. Munno, of counsel), for Defendant Ira J. Hechler.

Proskauer Rose Goetz & Mendelsohn, (Leon P. Gold, Mark E. Davidson, Stephen D. Solomon, Mark P. Monack, of counsel), and Wilkie Farr & Gallagher (Michael R. Young, Nicole A. Anderson, of counsel) (Scott M. Univer, Barbara A. Taylor, BDO Seidman, L.L.P., of counsel), New York City, for Defendant and Third–Party Plaintiff BDO Seidman, L.L.P.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs bring this class action on behalf of all individuals who purchased common stock of The Leslie Fay Companies, Inc. ("Leslie Fay" or "the Company") between February 4, 1992 and April 5, 1993 (the "Class Period"). The Amended Complaint asserts claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder against a number of Leslie Fay's officers and directors and BDO Seidman ("BDO"), the Company's outside auditor.

This court denied BDO's motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. *See In re The Leslie Fay Companies, Inc. Securities Litigation*, 871 F.Supp. 686 (S.D.N.Y.1995); *In re The Leslie Fay Companies, Inc. Securities Litigation*, 835 F.Supp. 167 (S.D.N.Y. 1993). BDO then filed cross-claims and third-party claims against officers and directors of Leslie Fay.[1]

The action is presently before the court on various TPDs' motions to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, TPDs' motions are granted in part and denied in part.

## BACKGROUND

Plaintiffs allege that from 1990 through 1992, the officers and directors of Leslie Fay, a well-known manufacturer of women's ap-

---

1. BDO filed three sets of claims: (1) cross-claims against defendants Chairman & CEO John J. Pomerantz ("J. Pomerantz"), President & COO Alan Golub ("Golub") and Senior Vice President & CFO Paul F. Polishan ("Polishan") [collectively referred to as "Senior Management"], and against directors Senior Vice President Laura H. Pomerantz ("L. Pomerantz"), Senior Vice President & General Counsel Herman Gordon ("Gordon") and Ira J. Hechler ("Hechler") [collectively referred to as the "Directors"], and against Controller Donald Kenia ("Kenia") (the "SM–CC"); (2) third-party claims for contribution against directors Steven M. Friedman ("Friedman"), Jack Nash ("Nash"), Lester Pollack ("Pollack") and Odyssey Partners L.P. ("Odyssey"), a private investment concern of which Friedman and Nash were general partners and Pollack was a limited partner [collectively referred to as "Odyssey" or the "Odyssey Investors"] and against director Michael L. Tarnopol ("Tarnopol") (the "Odyssey–TPC"); and (3) third-party claims against Arthur S. Levine ("Levine"), John A. Ward ("Ward") and Gerald P. Zipp ("Zipp") [collectively referred to as the "Division Presidents"], and Ralph Destino ("Destino") (the "DP–TPC"). All titles were held during times relevant to this case. In this Opinion, moving defendants and third-party defendants will be referred to as "TPDs."

parel, engaged in a fraudulent scheme designed to deceive the investing public as to its financial viability. Plaintiffs further allege that BDO participated in this scheme by attesting to the accuracy of financial disclosures that it knew, or recklessly failed to discover, were false and misleading. Plaintiffs allege that to support its public misrepresentations, Leslie Fay altered company financial records in two ways. First, the Company manipulated its books, chiefly the general ledger, to overstate assets and understate liabilities. Leslie Fay utilized these misstatements to conceal shortfalls from divisional budgeted goals. Second, Leslie Fay further altered its books and records by, among other things, manipulating inventory counts, classifications, costs, accounts payable, and expenses to substantiate these accounting irregularities. In all, the fraud involved several hundred journal entries, made in more than one hundred different general ledger accounts, occurring over an extended period of time, and involving at least 15 Leslie Fay employees.

The overall result of this scheme was that in the years 1990 through 1992, respectively, Leslie Fay's gross profits were overstated by $3 million (1.1%), $12.4 million (5.1%), and $35 million (18.9%), and its per-share earnings by $0.15 (10.9%), $0.48 (44.9%), and $1.84 (347.2%), while its pretax income over the three-year period was overstated by a total of $75 million.

Leslie Fay retained BDO to provide independent auditing services for the years ending December 29, 1990 and December 28, 1991. BDO issued unqualified opinions for each of those years, which were included in Leslie Fay's 1990 and 1991 Form 10–K reports and 1990 and 1991 Annual Reports to Shareholders, respectively, attesting to the accuracy of Leslie Fay's financial statement schedules and their conformity with Generally Accepted Accounting Principles ("GAAP"). In addition, BDO certified that it performed its audits in accordance with Generally Accepted Auditing Standards ("GAAS"). Based on the pervasiveness of the manipulation described above, plaintiffs allege that BDO either knew or was reckless in failing to discover that its unqualified opinions were wholly unfounded.

On February 1, 1993, the Company announced that it had requested that the board of directors' audit committee commence an investigation into "accounting irregularities" which might cause Leslie Fay to restate previously reported earnings for 1991 and to eliminate any profit for 1992. The Company suspended Corporate Controller Donald Kenia pending the outcome of the investigation, but Leslie Fay's CEO, John Pomerantz, insisted, in a widely distributed press release, that the financial viability of the Company was not in jeopardy. On the same day Leslie Fay's General Counsel, Herman Gordon, announced that the audit committee would investigate inaccurate entries involving an overstatement of inventory and a reduction of the cost of goods sold. As a result of this announcement, trading in Leslie Fay stock was suspended and at the end of the trading day the stock had fallen to $7⅞ per share from its close of $12 per share on the previous day. On February 2, 1993, it was reported that Kenia had admitted that he and 15 other employees of the Company's Wilkes–Barre, Pennsylvania offices had been falsifying invoices for over one year, and the Company announced that the false entries began in the last quarter of 1991 and continued through all of 1992. Upon announcing his fraud, Kenia stated that he was coming forward because the discrepancies caused by the falsifications had become too large to hide. On February 16, 1993, Leslie Fay announced that it had commenced an investigation into possible false SEC filings made by the Company, and on March 26, 1993, it was announced that Leslie Fay was the subject of a Commission investigation as well. On March 22, 1993, Paul Polishan, CFO of the Company, took a leave of absence pending the final outcome of the Audit Committee report. Finally, on April 5, 1993, Leslie Fay filed a voluntary bankruptcy petition under Chapter 11 of the Federal Bankruptcy Code, and in response, its common stock price fell to $2.75 per share. After the overstatements were revealed by the Audit Committee on February 26, 1993, BDO withdrew its 1991 opinion. Plaintiffs' class action followed.

BDO's motion to dismiss was denied by this court. *See In re The Leslie Fay Companies, Inc. Securities Litigation,* 871 F.Supp. 686 (S.D.N.Y.1995). BDO then filed cross-claims and third-party claims against various officers and directors of Leslie Fay, asserting contribution claims under the federal securities laws and common law claims for negligent misrepresentation, unjust enrichment and mutual mistake. *See supra* n. 1. The case is presently before the court on motions to dismiss submitted by various TPDs.

## DISCUSSION

On motions to dismiss, we have a limited task. The factual allegations in the cross-claims and third-party claims must be accepted as true, and must be construed favorably to third-party plaintiff BDO. A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if it appears beyond doubt that third-party plaintiff can prove no set of facts entitling it to relief. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985).

## I. Statute of Limitations

As a preliminary matter, we address Odyssey's statute of limitations defense to BDO's claim for contribution under section 10(b). Odyssey argues that the Supreme Court's holdings in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 294–300, 113 S.Ct. 2085, 2090–92, 124 L.Ed.2d 194 (1993), "mean that the common law rule on the accrual of a cause of action for contribution is not applicable to claims for contribution by a violator of § 10(b) of the 1934 Act." Mem. of Law in Support of the Motion of Third–Party Defendants Steven M. Friedman, Jack Nash, Lester Pollack and Odyssey Partners, L.P. to Dismiss the Third–Party Complaint of BDO Seidman, at 12 ("Odyssey Motion"). In *Lampf,* the Supreme Court held that the applicable statute of limitations for a section 10(b) suit was to be borrowed from section

9(e) of the 1934 Act. 501 U.S. at 364 n. 9, 111 S.Ct. at 2782 n. 9. Section 9(e) provides:

Any person who willfully participates in any act or transaction in violation of subsections (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction.... Every person who becomes liable to make any payment under this subsection may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment. *No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years of such violation.*

15 U.S.C. § 78i(e) (emphasis added). In the present case, BDO filed its cross-claims and third-party claims on March 29, 1995. Odyssey argues that (1) BDO had notice of the facts underlying its claims more than one year prior to March 29, 1995; and, (2) in any case, the statute of limitations bars all claims arising out of events that occurred before March 30, 1992 (effectively barring all claims asserted by BDO because all relevant events purportedly occurred prior to March 30, 1992).

In the only case known to this court that has addressed the issue of the applicable statute of limitations for a claim of contribution under section 10(b), *Ades v. Deloitte & Touche,* 1993 WL 362364 (S.D.N.Y. Sept. 17, 1993), Judge Sweet rejected the same argument that is asserted now by Odyssey. In *Ades,* investors alleged section 10(b) claims against Deloitte & Touche which, in turn, filed third-party claims against others. Some of the third-party defendants moved to dismiss based on the argument Odyssey makes here: The Supreme Court, in *Lampf,* had created a new statute of limitations for contribution claims. *Id.* at *15. Judge Sweet distinguished *Lampf* on the ground that "*Lampf* does not address the question of the statute of limitations for a contribution claim or in any other way change the existing rule, which is that an action for contribution accrues at the time a judgment is entered

against the direct defendant and is paid by him." *Id.* at *16.

Odyssey urges that Judge Sweet did not properly read *Lampf* in conjunction with *Musick, Peeler* to arrive at the conclusion that federal law has displaced common law principles with respect to contribution and limitations questions under section 10(b). In *Musick, Peeler,* the Supreme Court held that there was an implied right of action for contribution under section 10(b). 508 U.S. at 298–300, 113 S.Ct. at 2092. The Supreme Court found support for its conclusion in sections 9 and 18 of the 1934 Act. Odyssey argues that the one year after discovery/three years after violation limitation in section 9(e)—the limitation period applied in *Lampf*—must therefore apply to contribution claims under section 10(b).

Odyssey may be correct that *Lampf* displaced common law principles with respect to limitations questions involving direct section 10(b) claims, and that *Musick, Peeler* ruled that there is an implied federal right of action for contribution arising out of section 10(b). That does not mean, however, that these cases displaced common law principles with respect to limitations questions as they relate to section 10(b) contribution claims. The *Lampf* Court chose to apply the language of section 9(e) rather than that of section 18(c) (three years after violation, not three years after such cause of action accrued), *Lampf,* 501 U.S. at 364 & n. 9, 111 S.Ct. at 2782 & n. 9, but that Court addressed only the statute of limitations applicable to section 10(b) direct claims, not section 10(b) contribution claims. The *Musick, Peeler* Court inferred a cause of action for contribution from both sections 9 and 18 of the 1934 Act; the Court did not reach the question whether one section or the other would control the applicable statute of limitations for contribution claims.[2] The section 18(c) rule that begins the limitations period upon accrual is consistent with the long-

standing rule governing the accrual of contribution claims. In the absence of any authority supporting the idea that *Lampf* alters the long-standing rule governing the accrual of contribution claims, we decline to change that rule. *Ades,* 1993 WL 362364, at *16. We agree with Judge Sweet that *Lampf,* even when read in conjunction with *Musick, Peeler,* does not compel a conclusion that the applicable statute of limitations for a section 10(b) contribution claim is the one-year/three-years from the time of violation rule of section 9(e).

The Division Presidents seem to think that the facts that the plaintiffs (1) dismissed their action as to Ward and Zipp and (2) never named Levine a defendant somehow affect the statute of limitations issue. These facts do not change the outcome as to them. For the reasons just discussed, BDO's right to contribution has not yet accrued so that the statute of limitations has not yet begun to run on BDO's section 10(b) contribution claim. Furthermore, "[t]he goal of the securities laws is not just to compensate persons who have been defrauded but also to deter violations of those laws. This goal is advanced by a recognition of liability for contribution among joint offenders and by a recognition that liability does not depend on the plaintiff's having elected to proceed against all those who have offended." *Ades,* 1993 WL 362364, at *9 (citing *Tucker v. Arthur Anderson & Co.,* 646 F.2d 721, 727 n. 7 (2d Cir.1981)).

## II. Section 10(b) and Rule 10b–5 Contribution

Rule 10b–5, promulgated under section 10(b), makes it unlawful "for any person, directly or indirectly ... [t]o employ any device, scheme, or artifice to defraud, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or ... [t]o engage in any

---

**2.** Section 9(e) of the 1934 Act provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years *after such violation."* 15 U.S.C. § 78i(e) (emphasis added). Section 18(c) provides that "[n]o action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years *after such cause of action accrued."* 15 U.S.C. § 78r(c) (emphasis added).

act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. This provision provides an implied cause of action where defendants made a knowing misrepresentation or omission of material fact in connection with the purchase or sale of a security which caused plaintiffs' loss. To state a claim under section 10(b), a plaintiff must allege acts indicating an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 192 n. 7, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976). Furthermore, a claimant must show scienter by proving either actual knowledge or recklessness. *Aaron v. S.E.C.,* 446 U.S. 680, 696, 100 S.Ct. 1945, 1955–56, 64 L.Ed.2d 611 (1980); *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982).

It is well established that the right of contribution for violations of the federal securities laws exists among "joint tortfeasors." *See Greene v. Emersons, Ltd.,* 102 F.R.D. 33, 36 (S.D.N.Y.1983), *aff'd sub nom. Kenneth Leventhal & Co. v. Joyner Wholesale Co.,* 736 F.2d 29 (2d Cir.1984); *see also Tucker,* 646 F.2d at 727 n. 7 ("[U]nder the securities laws, a person who has defrauded the plaintiff in violation of those laws may be liable for contribution to another person who has similarly defrauded the plaintiff."). Considerably less well-settled, however, is the question of how to define "joint tortfeasor" in this context. The Second Circuit has expressly declined to reach this issue in at least one opinion. *See Kenneth Leventhal & Co.,* 736 F.2d at 31 n. 1.

**A. Joint Tortfeasors**

■ District court cases have defined "joint tortfeasors" in one of two ways. According to *Connecticut National Bank v. Reliance Insurance Co.,* 704 F.Supp. 506 (S.D.N.Y.1989), the majority view among the district courts in the Second Circuit appears to be that contribution among "joint tortfeasors" under the federal securities laws is limited to "joint participants" in the fraud alleged by plaintiff. 704 F.Supp. at 509; *see also Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 1993 WL 478115, *5 (S.D.N.Y. Nov. 12, 1993) ("The standard for contribution under § 10(b) requires that the defendants allege that [the third-party defendant] 'knowingly participated' in the fraud against the plaintiff."); *In re Crazy Eddie Securities Litigation,* 740 F.Supp. 149, 152 (E.D.N.Y. 1990) ("The courts in this circuit have interpreted [the joint tortfeasor] requirement to limit contribution to 'joint participant[s] in the fraud alleged by plaintiff,' and not to embrace also concurrent, independent actors.") (citing *Connecticut Nat. Bank,* 704 F.Supp. at 509; *Greene,* 102 F.R.D. at 36; *Stratton Group, Ltd. v. Sprayregen,* 466 F.Supp. 1180, 1185 (S.D.N.Y.1979)). Several courts outside this Circuit also have concluded that contribution in section 10(b) cases is only available among parties who knowingly participate in the same fraud. *See Stowell v. Ted S. Finkel Investment Servcs., Inc.,* 641 F.2d 323, 325–26 (5th Cir.1981) (for contribution under federal securities laws there must be allegations of joint securities act wrongdoing); *Alexander Grant & Co. v. McAlister,* 669 F.Supp. 163, 166 (S.D.Ohio 1987) (allegation of independent and concurrent action not sufficient under federal securities laws for contribution).

Other district courts, including this court, have applied a more expansive definition, holding that contribution among "joint tortfeasors" under the federal securities laws is available among independent tortfeasors so long as the parties are concurrently liable for damages. *See, e.g., Ades,* 1993 WL 362364; *McCoy v. Goldberg,* 778 F.Supp. 201 (S.D.N.Y.1991) (Conner, J.); *Marrero v. Abraham,* 473 F.Supp. 1271, 1277–78 (E.D.La.1979). These courts reason that there is no logical distinction between joint participants and parties who concurrently but independently cause damage by violating section 10(b). Of course, TPDs urge this court to adopt the more restrictive definition, and BDO the more expansive.

In *Greene,* 102 F.R.D. 33, a case often cited for the more restrictive definition of "joint tortfeasors," Judge Haight reasoned that since the wrong contemplated by the securities laws is fraud, then contribution

would lie only between knowing participants in the same fraud. 102 F.R.D. at 36. This situation is distinguishable, he asserted, from those involving common law tort cases of property damage where independent or concurrent acts of negligence may have contributed to a party's ultimate injury. *Id.* Consequently, Judge Haight concluded that "[t]here is no place for this broader concept of contribution in anti-fraud securities cases." *Id.*

On the other hand, in *Marrero*, 473 F.Supp. at 1277–78, the court concluded that contribution under federal securities laws was available among independent, concurrent tortfeasors. It reasoned that since the purpose of contribution is to allow a fair allocation of damages among wrongdoers, a distinction between joint participants working on a common scheme and those who concurrently and independently cause damage to a party made no logical sense. 473 F.Supp. at 1277–78. *See also Jordan v. Madison Leasing Co.*, 596 F.Supp. 707, 711 (S.D.N.Y.1984) (a finding of "joint liability" under the federal securities laws is based "on common liability to the injured party and not necessarily upon the same tort").

We do not disagree with Judge Haight's analysis that a purpose of the federal securities laws is to deter the commission of fraud in connection with the sale and purchase of securities. We therefore agree that an expansive definition of "joint tortfeasor" under the federal securities laws to include independent tortfeasors who are unconnected to the underlying fraudulent securities scheme is inappropriate. The more expansive definition adopted in *Marrero* and its progeny, however, do not conflict with Judge Haight's analysis.

In *Marrero*, unlike the cases applying the more restrictive definition of "joint tortfeasors," the third-party complaint alleged a violation of the federal securities laws by the third-party defendants. *Marrero*, 473

F.Supp. at 1276.[3] The court held that these concurrent though independent violations of federal securities laws merited a more expansive definition of "joint tortfeasors" than one requiring joint participation. It was the allegation that two independent violations of Rule 10b–5, one alleged in the complaint and one alleged in the third-party complaint, had combined to produce a single injury to the plaintiff which formed the basis for the district court's reasoning. *Marrero*, 473 F.Supp. at 1277. Allowing contribution in such circumstances is consistent, we believe, with Judge Haight's concern that contribution under the federal securities laws be limited to those engaged in the kind of fraud that the securities laws contemplate. *Cf. Tucker*, 646 F.2d at 727 n. 7 (contribution available from one who "similarly defrauded" plaintiff).

As this court noted in *McCoy*, at least one court in the Southern District of New York has interpreted *Tucker* to mean that the definition of "joint tortfeasor" for the purpose of a claim for contribution under the federal securities laws does not necessarily require joint participation. In *Department of Economic Development v. Arthur Andersen & Co.*, 747 F.Supp. 922 (S.D.N.Y.1990), Judge Stewart explained *Tucker* as follows:

[I]n stating that the securities law contribution claim in *Tucker* was proper, Judge Kearse implicitly had to have also concluded that an independent securities law violation committed by the *Tucker* third-party defendants against the plaintiff was also adequately alleged.

747 F.Supp. at 934.

Thus interpreting *Tucker*, Judge Stewart lent his support to the view, originally articulated in *Marrero*, 473 F.Supp. at 1277–78, that the existence of two alleged independent violations of Rule 10b–5, one alleged in the complaint and one alleged in the third-party complaint, combining to produce a single injury to the plaintiff, may form the basis for a

---

**3.** In contrast, for example, the *Connecticut Bank* court found:

In the present case, neither plaintiff nor third-party plaintiff has alleged that Batehill or BEHR [the third-party defendants] perpetrated any fraud on plaintiff. It is also not clear that

BEHR or Batehill would be liable to plaintiff for any security violations they committed, and thus even on the broader "common liability" theory advocated by [third-party plaintiff], an action for contribution would not lie.

704 F.Supp. at 510.

contribution claim under the federal securities laws. In *Department of Economic Development*, no such allegations were made, and thus the third-party plaintiffs' contribution claim was dismissed. Relying in part on Judge Stewart's well reasoned analysis, we thus adopted in *McCoy* a definition of "joint tortfeasors" which includes independent tortfeasors who concurrently cause the same injury to plaintiff. TPDs in the instant case, as did third-party defendants in *McCoy* (citing *Stratton*, 466 F.Supp. at 1187, and *Greene*, 102 F.R.D. at 36), argue that BDO had failed to allege that TPDs knowingly participated in the underlying fraud. As stated in *McCoy*, both these cases are distinguishable; in each, third-party plaintiffs failed to allege that the third-party defendants had violated the securities laws and had participated in the underlying fraud:

> [T]he Third–Party Complaint clearly alleges that 'Third–Party Defendants, in connection with plaintiff's purchase of the units ... employed devices, schemes or artifices to defraud, made untrue statements of material facts and omitted to state other material facts ... all in violation of Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder.' T.P.C. ¶ 39. The Third–Party Complaint also alleges that Phoenix Leasing 'had actual knowledge' of its allegedly false and misleading statements and that '[p]laintiff's losses were proximately caused by third-party defendants' representations and omissions.' *Id.*
>
> . . . .
>
> As Judge Haight noted in *Greene*, the wrong to be deterred by the federal securities laws is fraud in the connection with the sale and purchase of securities. *See Greene*, 102 F.R.D. at 36; *see also Department of Economic Dev.*, [747 F.Supp.] at 933. Here, the Third–Party Complaint alleges just such a fraud on the part of third-party defendants. Thus allowing contribution in the present matter is entirely consistent with *Greene* and *Stratton*. To require, as third-party defendants urge, a definition of 'joint tortfeasor' that is narrow enough to eliminate Phoenix Leasing would be virtually to eviscerate the right of contribution under Section 10(b). Accord-

ingly, the Court denies the instant motion to dismiss third-party plaintiff's contribution claim under Section 10(b).

*McCoy*, 778 F.Supp. at 204–05.

At least one court has explicitly endorsed our view expressed in *McCoy*. *See Ades*, 1993 WL 362364. In *Ades*, the third-party defendant (relying on *Connecticut National Bank*, *Greene*, and *Stratton*) asserted the same argument pressed by TPDs in the instant case: "Because it and [third-party plaintiff] did not knowing[ly] commit the same fraud upon the Plaintiffs, [third-party defendant] and [third-party plaintiff] do not qualify as 'joint' tortfeasors and [third-party plaintiff] is barred from asserting a right of contribution against [third-party defendant]." *Ades*, 1993 WL 362364, at *14. The court applied this court's reasoning articulated in *McCoy*:

> Bolar, like the partnerships in *McCoy*, attempts to rely on the language in two older cases, *Stratton Group, Ltd. v. Sprayregen*, 466 F.Supp. 1180, 1187 (S.D.N.Y. 1979) ("a necessary predicate for contribution ... is an allegation that [the third-party defendant] was a joint participant in the fraud alleged in the main action"), and *Greene v. Emersons, Ltd.*, 102 F.R.D. 33, 36 (S.D.N.Y.1983) (holding "that contribution lies only between knowing participants in the same fraud"), *aff'd on other grounds by Kenneth Leventhal & Co.*, 736 F.2d 29 (in which, as noted above, the Second Circuit declined to reach this issue). However, these decisions are distinguishable: "in each, third-party plaintiffs failed to allege that the third-party defendants had violated the securities laws and had participated in the underlying fraud." *McCoy*, 778 F.Supp. at 204–05.

*Id.*, at *14. Because we conclude that the definition of joint tortfeasors includes independent and concurrent tortfeasors who similarly defrauded plaintiffs, we dismiss TPDs' arguments that BDO has failed to state a cause of action for contribution under section 10(b) for failure to allege joint participation.

We conclude that defining "joint tortfeasors" to include independent tortfeasors who concurrently cause the same harm to plain-

tiffs furthers the purposes of federal securities laws. It is well established that recklessness is sufficient to constitute scienter under section 10(b). *See, e.g., Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir.1991); *IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980) (Friendly, J.); *Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). As we previously ruled, the Amended Complaint's "red flag" warnings about certain accounting irregularities and BDO's failure to investigate these irregularities support plaintiffs' allegations of recklessness on the part of BDO in a manner sufficient to survive a motion to dismiss. *See In re The Leslie Fay Companies, Inc. Securities Litigation,* 871 F.Supp. 686 (S.D.N.Y.1995). To bar contribution on the ground that one of the alleged tortfeasors acted with recklessness and therefore could not be a knowing joint participant would make no sense given that an allegation of recklessness is sufficient to assert a cause of action for direct liability.

Indeed, the Supreme Court, in focusing upon the harm which the securities laws were designed to deter, did not imply a need to find a deliberate conspiracy among tortfeasors. "The violation of the securities laws gives rise to the 10b–5 private cause of action, and the question before us is the ancillary one of how damages are to be shared among persons or entities already subject to that liability," *Musick, Peeler,* 508 U.S. at 292, 113 S.Ct. at 2088. Therefore, "the approach to the issue should not turn on how 'joint tortfeasor' is defined but rather on an assessment of the goals of both the securities laws and contribution." *Department of Economic Development,* 747 F.Supp. at 933. Here BDO alleges that all TPDs participated in material fraudulent misrepresentations about Leslie Fay—the same fraud on which liability is asserted against BDO—made to the plaintiffs, upon which the plaintiffs relied and which affected the market price of Leslie Fay's stock. Although the alleged joint participation of BDO and TPDs in the misrepresentations about Leslie Fay's financial condition may not have been "knowing" according to the allegations in BDO's cross-claims and third-party claims, they are "joint" in the sense that the alleged actions of both similarly defrauded plaintiffs.

■ TPDs' implication that BDO's action for contribution should be dismissed for lack of standing is meritless. TPDs make reference to the fact that the *Connecticut National Bank* court held, in the alternative, that the third-party plaintiff did not have standing to sue under the securities laws because third-party plaintiff was not alleged to have purchased or sold any securities. This "alternative holding" conflicts with the Supreme Court's holding in *Musick, Peeler* that a defendant in a securities fraud case has a claim for contribution as a matter of right. In addition, Second Circuit decisions which have held there is a right to contribution under section 10(b) have assumed without discussion that the party asserting the right need not be a purchaser or seller of securities. *Tucker,* 646 F.2d at 727 (accountants permitted to bring third-party complaint against officer of issuer corporation); *Sirota,* 673 F.2d at 578 (right of accountants to assert contribution claims against issuer upheld). "A claim for contribution is a derivative claim. Contribution is concerned only with the apportionment of liability among persons all liable for the plaintiffs' harm, not to liability for wrongs committed by such against each other." *Ades,* 1993 WL 362364, at *15.

■ Finally, TPDs invoke relief under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), where the Supreme Court eliminated aiding and abetting liability under section 10(b). The Supreme Court left unanswered, however, where to draw a line between secondary and primary liability. Although it made clear that giving aid to a person who commits securities fraud violations is not within the statute, the Supreme Court added:

> Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under securities Acts. Any

person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. . . . In any complex securities fraud, moreover, there are likely to be multiple violators; this case, for example, respondents names four defendants as primary violators.

—— U.S. at ——, 114 S.Ct. at 1455 (emphasis in original). Our conclusion is consistent with *Central Bank* because BDO alleges that TPDs directly committed violations of the securities laws.

**B. Rule 9(b)**

█ TPDs contend that BDO's claims under section 10(b) do not allege scienter with sufficient particularity under Fed.R.Civ.P. 9(b). Rule 9(b) requires that

the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). In most cases, the rules merely require the plaintiff to plead a "short and plain statement" setting forth the allegations and grounds for relief. Fed.R.Civ.P. 8. The Second Circuit has held that the requirements of Rule 9(b) and Rule 8(a) "must be read together." *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987). The particularity requirement serves three purposes: (1) it affords the defendants fair notice of the facts upon which the claim is based; (2) it safeguards the defendants' reputation and goodwill from unfounded charges; and (3) it discourages "strike suits." *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). "[T]he relaxation of Rule 9(b)'s specificity requirement for scienter 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.' " *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (citations omitted).

Thus, the Second Circuit requires plaintiffs to allege facts that give rise to a strong inference of fraudulent intent. *Id.* In order to properly allege scienter under Section 10(b), a plaintiff must allege facts that either show that the defendant had motive and opportunity to commit fraud or constitute strong circumstantial evidence that the defendant acted knowingly or recklessly. *Id.* at 1128.

█ In the case at hand, BDO contends that TPDs harmed plaintiffs by making material misstatements and by failing to disclose accounting irregularities, of which TPDs were aware, or recklessly failed to discover. BDO also contends that any fraud for which BDO may ultimately become liable is directly tied to the even greater fraud committed by TPDs. For example, BDO has alleged that the Odyssey Investors

violated Section 10(b) and Rule 10b–5 promulgated thereunder, by engaging with Senior Management in, or participating in, a plan or scheme and common course of conduct to artificially inflate the market price of Leslie Fay's stock and making misstatements and omissions regarding the Company and its financial condition. Each Individual Third–Party Defendants knew, or was reckless in failing to know, that Leslie Fay's 1990 and 1991 financial statements and other financial disclosures were not fairly presented in accordance with GAAP.

Odyssey–TPC ¶ 170.

As for Hechler, BDO has alleged that he, along with others, "recklessly disregarded clear warnings [sic] signs that Leslie Fay's financial statements were false and misleading and that the representations which had been made to BDO in connection with the audits of its financial statements were likewise false and misleading." SM–CC ¶ 235.

Furthermore, BDO has alleged that the Division Presidents have primary liability arising out of their contribution to the financial misstatements which appeared in annual reports, 10–Ks and 10–Qs, and prospectuses for the years 1990 and 1991. BDO asserts that the Division Presidents knew that they were submitting material misstatements to

be incorporated in the consolidated financial results of Leslie Fay. BDO also asserts that the Division Presidents are liable for failing to correct materially false and misleading statements which they knew to be false at the time they made them.

The Division Presidents argue that, while Ward and Zipp were corporate officers, they were not spokesmen for the Company and did not control corporate policy or communications to shareholders or the investing public. Mem. of Law in Support of Motion by Third–Party Defendants Arthur S. Levine, John A. Ward, and Gerald P. Zipp to Dismiss BDO Seidman's Third Party Compl., at 7 ("Division Presidents MTD"). Furthermore, they argue that Levine held no corporate title and also did not control corporate policy or communications to shareholders or the investing public. *Id.* "The responsibility of each of the Division Presidents was limited to their respective divisions." *Id.* "Overseeing all of the divisions with responsibility for setting corporate policy and being corporate spokesmen were, as BDO has termed them, "Senior Management": John J. Pomerantz ("Pomerantz"), the Chief Executive Officer; Alan Golub, the Chief Operating Officer; and Paul F. Polishan ("Polishan"), the Chief Financial Officer, who for organizational purposes were all in the Corporate division." *Id.*

The Division Presidents argue that the actions alleged in BDO's third-party claims are insufficient to establish liability because (1) the Division Presidents cannot be held accountable based solely on their status as "officers" of the Corporation because the Division Presidents did not hold positions of corporate policy or spokespersons and (2) the Division Presidents did not draft, issue or sign any of the Company's public financial documents.

The Division Presidents rely on *In re Union Carbide Corp. Consumer Products Business Securities Litigation,* 666 F.Supp. 547 (S.D.N.Y.1987), for the proposition that there must be some personal liability on their part for any misrepresentation, deception, or non-disclosure, beyond the mere fact that they have titles of "officers." However, that case can be readily distinguished because the plaintiffs in that case failed to allege any action on the part of the officers that had any relationship to allegedly false and misleading statements in connection with the sale of securities:

> [T]he Court finds no factual basis presented for the plaintiffs' broad, conclusory allegations that the defendant[s] engaged in any scheme to defraud, made any misleading statements, or engaged in frauds or deceits with respect to the issuance or sale of the [securities]. Furthermore, the facts alleged do not support the plaintiffs' more specific allegations that these defendants participated in the preparation, dissemination, or issuance of materially misleading documents allegedly issued by [the company].... Finding no allegation of participation or direct involvement by [the officers] in the drafting, editing or issuance of the relevant documents, this Court concludes that the facts alleged are insufficient to support an allegation of a primary violation of Rule 10b–5 by either [officer].

666 F.Supp. at 560. That court accepted defendants' argument that "they lacked the authority to disclose or to correct such documents or statements." *Id.* at 563.

> [The Court] rejects the notion ... that [the officers], whose responsibilities to Union Carbide were in the area of manufacture of home and automotive products, had a corporate duty, *ex officio,* to disclose or to correct any misleading statements contained in union Carbide documents prepared for the corporation by others, or to disclose or to correct any misrepresentations or omissions with respect to the purchase or sale of Union Carbide securities made by others, although they may have had apparent or statutory authority to do so, if so advised.

> Our Circuit has held that, in the absence of direct participation in a securities violation, an outside director of a corporation has no duty to disclose adverse material facts or information to those prospective purchasers.

666 F.Supp. at 563.

In the case at hand, however, BDO has alleged that the Division Presidents are liable for the misstatements which they know-

ingly made and which were expressed to plaintiffs in public financial documents. BDO has alleged sufficient facts that, if proven true, could lead a jury reasonably to conclude that the Division Presidents recklessly made misstatements concerning financial results that they knew would mislead investors. The fact that the Division Presidents were not responsible for consolidating and gathering the financials, and did not sign any of the public documents does not absolve them of liability. For example, Count I of the third-party complaint against the Division Presidents alleges that the Division Presidents violated section 10(b) and Rule 10b–5

> by engaging with Senior Management in, or participating in, a plan or scheme and common course of conduct to artificially inflate the market price of Leslie Fay's stock and making misstatements and omissions regarding the Company and its financial condition. [Zipp, Ward and Levine] knew, or were reckless in failing to know, that Leslie Fay's 1990 and 1991 financial statements and other financial disclosures were not fairly presented in accordance with GAAP.

DP–TPC, ¶ 174. Furthermore, as to contribution claims asserted against the Division Presidents as well as against other moving TPDs, BDO incorporates by reference all the preceding paragraphs that identify what statements were made by whom, and when they were made. *See* SR–CC ¶¶ 173, 176; Odyssey–TPC ¶¶ 168, 172; DP–TPC ¶¶ 172, 176. BDO alleges sufficient facts that show that the defendant had motive and opportunity to commit fraud or constitute strong circumstantial evidence that the defendant acted knowingly or recklessly.

## III. Section 20

■ BDO invokes section 20 of the Securities Exchange Act of 1934 to assert liability against the Odyssey Investors and Hechler for contribution as controlling persons for violation of section 10(b). Odyssey and Hechler move to dismiss BDO's section 20(a) claim for failure to allege "control person" liability. Section 20(a) of the 1934 Act provides that

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a claim under section 20, a plaintiff must allege (1) a primary violation, (2) scienter, and (3) control of the primary violator by the defendant. *Robbins v. Moore Medical Corp.*, 788 F.Supp. 179, 188 (S.D.N.Y.1992).

■ Control is defined by the Securities and Exchange Commission as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2.

The Odyssey Investors argue that (1) control status cannot be inferred simply from positions as outside directors; (2) membership on the Audit Committee is not sufficient to give rise to an inference of power to control management; and (3) ownership of a non-controlling share of stock, by definition, cannot give rise to an inference of control over management.

The Odyssey Investors first assert that an individual's status as a corporate director, standing alone, is insufficient to impose liability under section 20. *See Kimmel v. Labenski*, 1988 WL 19229 (S.D.N.Y. Feb. 10, 1988) (dismissing section 20(a) claim against outside directors who were members of the board's audit committee and signed the company's Form 10–K reports). The Odyssey Investors argue that the intent of the Congress in enacting section 20 "was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973). Odyssey then argues that BDO alleges no facts indicating that the Odyssey Investors' combined 12%

"non-controlling" percentage of stock ownership gave them the ability to control the activities of management. *Odyssey Motion*, at 10. However, *Treadway Cos. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980) (company's largest shareholder, owning 14% of company's stock, was not a "controlling shareholder" and did not have "control of corporation" for purpose of deciding whether or not he had to share a "control premium" upon his sale of stock with other shareholders), cited favorably by Odyssey, is not dispositive. The Second Circuit merely upheld the district court's "specific" finding that the 14% shareholder did not have control of the corporation. 638 F.2d at 377; *see also id.*, at 377 n. 39 ("The court noted that in December 1977 [the 14% shareholder] had requested that he be made Chairman of [the company's] board of directors, but that the other directors refused this request."). We do not believe that that court ruled that a 14% ownership interest is *per se* non-controlling. In any case, BDO does not rest solely on a 12% stock ownership in support of its section 20 "controlling person" claim; nor does BDO assert liability based solely on the Odyssey Investors' positions as outside directors. In short, Odyssey attempts to isolate various indicia of control and argue that each, by itself, does not establish control person liability. Of course, we must consider the total effect of the various indicia of control in combination.

As noted in *Robbins*:

The law governing the sufficiency of pleadings of scienter by controlling persons is unclear. Eighteen years ago the Court of Appeals for this Circuit ruled that a plaintiff must allege that the alleged controlling persons were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons," *Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974) (reversing finding of control person liability for want of evidence of defendant's knowledge of or participation in fraud), a ruling that has retained some vitality. *See, e.g., Brickman v. Tyco Toys, Inc.*, 731 F.Supp. 101, 106 (S.D.N.Y.1990). Other well-reasoned opinions in this District, however, have argued that § 20 "now only requires that the plaintiff allege and

prove control, leaving it to the defendant to plead and prove good faith and lack of participation." *Healey v. Chelsea Resources Ltd.*, 736 F.Supp. 488, 495 (S.D.N.Y.1990) (Carter, J.) (citing *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. denied sub nom. Wood Walker & Co. v. Marbury Management, Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 [ (1980) ] ). *See also Borden, Inc. v. Spoor Behrins Campbell & Young*, 735 F.Supp. 587, 590 (S.D.N.Y.1990) (Conner, J.).

788 F.Supp. at 188. The *Robbins* court concluded that the complaint in question was adequate because "[i]t recite[d] the position of each individual defendant at [the company] (all were directors or officers during at least part of the class period) and identifie[d] those defendants who signed statements made by the company or otherwise issued statements alleged to be misleading [and went] on to aver their knowing or reckless participation in the alleged scheme...." *Id.* BDO has alleged that each TPD signed at least one of the allegedly fraudulent documents, which, BDO argues, supports the inference that defendants exercised a degree of control over the company's operations and representations. Such allegations are sufficient at the pleadings stage under § 20(a). *Id.* at 189; *Borden, Inc. v. Spoor Behrins Campbell & Young*, 735 F.Supp. 587, 588–91 (S.D.N.Y.1990) (Conner, J.); *In re The Leslie Fay Companies, Inc. Securities Litigation*, 1993 WL 438927, *5 (S.D.N.Y. Oct. 27, 1993) (Conner, J.) ("To properly allege control person liability under section 20(a) of the Securities and Exchange Act of 1934, plaintiffs need only allege that defendants either directly or indirectly held the power to exercise control over the primary violator.").

BDO alleges that each of the Odyssey Investors (Friedman, Nash and Pollack) and Hechler served as directors and reviewed and signed SEC filings containing fraudulent financial information. In addition, BDO specifically alleges that the Odyssey Investors were in a position to control and influence Leslie Fay's business and operations, particularly as to accounting and financial reporting policies. For example, BDO alleges:

During the class period, third-party defendants Friedman, Nash, Pollack, Tarnopol, and Odyssey were in a position to control and influence the business activities, accounting policies, practices and financial reporting of the Company, as well as the disclosures made by the Company in its press releases and SEC filings.... [T]hey were in a position to direct and influence the activities of Senior Management and prevent the commission of the fraud, but recklessly disregarded the material misstatements or omissions in the Company's 1990, 1991 and 1992 financial statements and in its SEC filings, press releases and other public statements during the class period, as a result of which the Company itself violated Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder and they personally benefitted.

Odyssey–TPC ¶ 206; *see also* SM–CC ¶¶ 254–58 (claim against Hechler). When viewing all the indicia of control in their entirety, we conclude that BDO has alleged sufficient facts to withstand Odyssey's and Hechler's challenge that "control" has not been sufficiently alleged to support a section 20(a) "control person" claim.

## IV. Section 12

■ BDO's claim against Friedman and Odyssey under section 12 of the 1933 Securities Act, 15 U.S.C. § 77*l*, must be dismissed. Section 12(2) provides

Any person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him....

15 U.S.C. § 77*l* (2).

As discussed above, BDO has alleged sufficient facts in its complaint to infer fraud on the part of Friedman and Odyssey to make them joint tortfeasors with respect to plaintiffs' section 10(b) claim against BDO. However, joint tortfeasor liability under section 10(b) allows BDO to assert claims against others who "similarly defrauded" plaintiffs. *Tucker*, 646 F.2d at 727 n. 7. A section 10(b) claim does not encompass fraud similar to a section 12 claim. It should be noted that plaintiffs do not, and could not, assert a claim under section 12.

Under section 12(2), a plaintiff may recover only from its immediate seller. *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir.1991), *cert. denied sub nom. Cortec Indus. v. Westinghouse Credit Corp.*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). *See also Pinter v. Dahl*, 486 U.S. 622, 642, 108 S.Ct. 2063, 2076, 100 L.Ed.2d 658 (1988) ("At the very least ... the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity. Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interests in the security, to the buyer for value."). Neither plaintiffs nor BDO alleges that plaintiffs purchased Leslie Fay stock directly from TPDs. This claim, therefore, does not fall within the reach of BDO's claim for contribution. BDO's pleas to equity cannot overcome the statutory limitations imposed by Congress in section 12(2).

## V. Negligent Misrepresentation

Odyssey argues that BDO's claim for negligent misrepresentation must be dismissed because (1) it is a disguised indemnity claim and (2) it fails to allege that the Odyssey Investors made any statement whatsoever which could constitute a misrepresentation. The Division Presidents add that BDO's claim against them must be dismissed for failure to satisfy the privity requirement of a claim for negligent misrepresentation.

### A. "Indemnity Claim in Disguise"

■ It is well settled, and BDO does not dispute, that a violator of section 10(b) may not seek indemnification. *See Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *see also*

*Greenwald v. American Medcare Corp.,* 666 F.Supp. 489, 493 (S.D.N.Y.1987) ("[N]o party who has himself knowingly and wilfully violated the federal securities laws may obtain indemnity from another violator of those laws."). Odyssey characterizes BDO's negligent misrepresentation claim as an impermissible indemnity claim in disguise. Odyssey Motion, at 14. Odyssey argues that if the allegations of the Amended Complaint are true, BDO has violated section 10(b), and BDO's damages will be the result of its own violations of federal securities laws. Odyssey Reply, at 22.

 BDO responds that its claim for negligent misrepresentation is not a claim for indemnity because its claim is based on a duty owed by Odyssey to BDO to provide honestly information that BDO requested, not based on joint liability to the plaintiffs, where one injurer tries to shift the blame to another injurer. If BDO was harmed by receipt of false information from Odyssey, and if BDO was completely without fault as to plaintiffs' claim for violation of section 10(b), BDO may possess an independent claim for misrepresentation. *See Greenwald,* 666 F.Supp. at 493 ("[N]o party who has himself knowingly and wilfully violated the federal securities laws may obtain indemnity from another violator of those laws.... [Third-party plaintiff], however, claims that he was totally without fault and did not himself violate the federal securities laws.... Accordingly, [third-party plaintiff] is entitled to an opportunity to prove that he was without fault and is therefore entitled to indemnity."). BDO argues that it suffered cognizable harms as a result of Odyssey's negligent misrepresentations, including incorrect and unfavorable publicity, harm to BDO's business and reputation, and litigation costs and attorneys' fees.

The issue whether an auditor's negligent misrepresentation claim can be sustained, independent of a claim for indemnity, was addressed by the Seventh Circuit in *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), where, as alleged here, the management of a corporation perpetrated a massive fraud, and shareholders sued the auditors (and others). The auditors settled with the shareholders, and then asserted a fraud claim against the company based on misrepresentations by corporate officials. At trial, the district court dismissed the fraud claim on the ground that the auditor was "just seeking indemnification from a codefendant, which ... is not allowed in a Rule 10b–5 case." *Id.* at 457. The Seventh Circuit reversed, holding that the auditor's claim for fraud and any claim for indemnity were separate claims. *Id.* at 457–58. Judge Posner explained:

> [I]ndemnity is a remedy of one wrongdoer against another; and [the auditor's] claim is that it was a victim rather than a wrongdoer. It is true that it paid several millions to the class plaintiffs, but it never admitted wrongdoing or was adjudicated a wrongdoer. Therefore, if it can prove that [the company] defrauded it into issuing false audit reports which in turn exposed it to liability to the class plaintiffs, the amount it paid to settle with the class would be a permissible item of damages.

*Id.* at 457–58.

Odyssey cites *Greene v. Emersons Ltd.,* 1985 WL 1989 (S.D.N.Y. June 28, 1985), for the proposition that, even if BDO is exonerated at trial, its request for indemnification for the cost of defending itself against claims arising out of its own alleged wrongdoing is not allowed. *See id.* at *2 ("[I]f it appears that a defendant, in part at least, is defending himself against claims of his own wrongdoing, then the traditional American Rule bars him from recovering his legal expenses from another, even if his defense is eventually upheld.").

Odyssey disputes BDO's argument that "its negligent misrepresentation claim rests on the premise that it has been dragged into this litigation solely due to its reliance on various 'representations' made to it by company officials—that its involvement is due to the 'tort of another.'" Odyssey Motion, at 22. Odyssey asserts that plaintiffs have alleged that BDO violated various specific provisions of GAAS and GAAP, including allegations that BDO failed to exercise due professional care, failed to obtain a sufficient understanding of the internal control

system, failed to obtain sufficient evidentiary material, failed to conduct subsequent events procedures with the proper level of professional skepticism, failed to inquire into numerous questionable journal entries, failed to inquire into the Company's methodology for calculating its chargeback reserves, and falsely advised the audit committee and the Board of Directors that the company's controls were satisfactory. *See* Odyssey Motion, at 22. Odyssey argues that, " '[g]iven the present plaintiffs' allegations of [the auditor's] own independent misconduct, it is difficult to conceive of [the auditor] as facing a cause of action which exists only because of the tort of another.' [E]ven if the allegations of the Amended Complaint are *not* true, and BDO is exonerated at trial, 'it has no viable claim that the conduct of other wrongfully involved [it] in this litigation with plaintiffs.' " *Id.*, at 23 (quoting *Cortec Indus. v. Sum Holding L.P.*, 1994 WL 722708, *3 (S.D.N.Y. Dec. 30, 1994). It should be noted, however, that Judge Haight in *Cortec*, 1994 WL 722708, was faced with the issue whether a court-approved settlement would bar a "tort of another" claim from a non-settling defendant for attorneys fees from settling defendants. *Id.* at *1. That is not the claim that is asserted by BDO.

We conclude that *Greene*, 102 F.R.D. 33, and the cases upon which it relied, *Safeway Stores v. Chamberlain Protective Servcs., Inc.*, 451 A.2d 66 (D.C.App.1982); *Weston v. Globe Slicing Machine Co.*, 621 F.2d 344 (9th Cir.1980), are distinguishable from the instant case, but for reasons other than those expressed by BDO.[4] These cases address whether an exception to the normal "Ameri-

can Rule" that each party shall bear its own costs is available to joint tortfeasors in certain circumstances. BDO does not simply seek indemnification for its attorneys fees. BDO has identified other harms that it has suffered due to Odyssey's alleged negligent misrepresentation in connection with this lawsuit. For example, BDO alleges that it suffered harm to its business and reputation as a result of its involvement in this litigation—involvement which was allegedly caused by Odyssey's negligent misrepresentations to BDO. BDO alleges that it suffered cognizable harm due to Odyssey's misrepresentations, not that TPDs should pay for BDO's attorneys' fees because BDO was forced to defend a suit charging BDO and Odyssey as joint tortfeasors, and BDO was wholly absolved of any liability on the merits. On a motion to dismiss, we draw all inferences favorably to BDO, and we accept as true all factual allegations in BDO's claims. At this stage, we deem it premature to dismiss BDO's claim for negligent misrepresentation based on the argument that it is an impermissible claim for indemnity in disguise. If BDO's allegations are proven true, then it has been harmed by TPDs' misrepresentations, and may seek redress.

**B. Rule 9(b)**

■ Odyssey argues that BDO's claim against Odyssey fails to allege any purported misrepresentation made by Odyssey, or to plead it with particularity. A claim for negligent misrepresentation must comply with the pleading requirement of Rule 9(b). *See, e.g., Garcia v. Spanish Broadcasting System, Inc.*, 1993 WL 177936, *3 (S.D.N.Y.1993) (dis-

---

4. BDO's attempt to distinguish these cases on the ground that they purportedly were discussing claims for indemnity is of no avail; the characterization is inaccurate. *See, e.g., Greene v. Emersons Ltd.*, 1985 WL 1989, *1 (S.D.N.Y. June 28, 1985):

> [Third-party plaintiff] professes that its claims 'are not in any respect claims for indemnity.' The disclaimer is accurate, so far as it goes; [Third-party plaintiff] by its crossclaims does not seek to shift upon [defendants] all or any part of liability [third-party plaintiff] may be adjudged to bear to plaintiffs. On the contrary: as noted supra, [third-party plaintiff's] crossclaims posit its exoneration in respect of

plaintiffs. Consequently, [third-party plaintiff's] crossclaims are not barred by the general rule, previously declared in this case, that indemnity is not available among tortfeasors in securities cases.

> In a larger sense, [third-party plaintiff] seeks indemnity by these crossclaims. [Third-party plaintiff] asserts a right to indemnity implied in law, on the basis of what has come to be recognized as a narrow exception to the 'American Rule' that each party bear his own expenses of litigation. It is a general rule that a party litigating a civil action must bear his own attorney's fees and expenses absent a contractual or statutory basis for liability.

1985 WL 1989, *1.

missing negligent misrepresentation count for failure to comply with Rule 9(b)); *Philan Ins. Ltd. v. Frank B. Hall & Co.*, 748 F.Supp. 190, 197 (S.D.N.Y.1990) (same).

Rule 9(b) requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). According to *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), the heightened pleading requirement serves three important purposes:

> First, it assures the defendant of " 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' ".... Secondly, the specificity requirement grows out of "the desire to protect defendants from the harm that comes to their reputations or to their goodwill when they are charged with serious wrongdoing...." [Thirdly,] in the context of securities litigation Rule 9(b) serves an additional important purpose. It operates to diminish the possibility that "a plaintiff with a largely groundless claim [will be able] to simply take up the time of a number of other people [by extensive discovery], with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence...."

607 F.2d at 557 (citations omitted). To satisfy Rule 9(b), plaintiffs must particularize and describe in detail each defendant's involvement in the alleged fraud. In this regard, BDO must specify:

(1) the fraudulent statements which were made and the documents containing those statements;

(2) the time and place of each such fraudulent statement and the person who made (or in the case of an omission did not make) the statement; and

(3) the content of the fraudulent statement, how it was misleading, and the manner in which it was relied upon by the plaintiff.

*Quintel Corp., N.V. v. Citibank, N.A.*, 589 F.Supp. 1235 (S.D.N.Y.1984). We conclude that BDO has satisfied each of these requirements. BDO incorporates by reference all paragraphs preceding the claim for negligent misrepresentation that identify what statements were made, by whom they were made, and when they were made. *See* SR–CC ¶ 249; Odyssey–TPC ¶ 232; DP–TPC ¶ 240. Furthermore, in the paragraphs incorporated by reference, BDO alleges sufficient facts setting forth the substance of allegedly misleading statements and the manner in which BDO relied on such statements.

### C. Elements of Negligent Misrepresentation

The New York Court of Appeals stated the elements of negligent representation as follows:

> As to duty imposed, generally a negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage ..., but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all....

*White v. Guarente*, 43 N.Y.2d 356, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977). A party is liable for a negligent misrepresentation if it is made with the knowledge, notice, and expectation that another will rely upon it, and if the other party in fact relies on the statement to his detriment. *Brown v. Stinson*, 821 F.Supp. 910, 914 (S.D.N.Y.1993) (Conner, J.). There must also be some relationship of trust between the parties from which defendant's duty to plaintiff arises. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

BDO asserts its negligent misrepresentation claim against Odyssey as follows:

> [T]hird-party defendants ... sign[ed] SEC filings containing material misrepresentations and participat[ed] in board meetings and Audit Committee meetings with BDO at which the 1990 and 1991 financial statements were discussed. Among other things, third-party defendants knowingly

or negligently participated in providing false and misleading information to BDO while they knew, or were negligent in not knowing, that [accounting irregularities and financial fraud were being committed at Leslie Fay].... Third-party defendants thereby caused and permitted BDO justifiably to rely, and to continue to rely in 1992, on the material misrepresentations of Senior Management, Kenia and other working under their supervision and control, for the purpose of inducing BDO to rely on those misrepresentations, to issue unqualified audit reports with respect to Leslie Fay's 1990 and 1991 financial statements and to become associated with Leslie Fay's public offering in June 1991.

Odyssey–TPC ¶ 233.

The Odyssey Investors argue that BDO fails to allege (1) any specific misrepresentations from the third-party defendants to BDO, (2) that BDO relied, and was intended by the third-party defendants to rely, on any such words or (3) that the third-party defendants owed BDO any duty of care. The Odyssey Investors argue that their mere presence at board meetings and Audit Committee meetings with BDO at which the 1990 and 1991 financial statements were discussed does not constitute sufficient "conduct" to support a claim for negligent misrepresentation. Under New York law, the Odyssey investors' mere presence and participation at such meetings could constitute sufficient conduct to support a claim for negligent misrepresentation, even if BDO does not allege that the Odyssey Investors made any affirmative statements in support of any of the information presented to BDO on which it was intended to rely:

> The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of plaintiff.

*Noved Realty Corp. v. A.A.P. Co.*, 250 A.D. 1, 293 N.Y.S. 336, 341 (1937). Odyssey's response that TPDs did not say anything false at the meetings is therefore insufficient:

"Conduct, even without speech, may be 'tantamount to a false representation.'" *Minpeco, S.A. v. ContiCommodity Services, Inc.*, 552 F.Supp. 332, 336 (S.D.N.Y.1982) (quoting *D'Alessandra v. Manufacturers Cas. Ins. Co.*, 106 N.Y.S.2d 561, 564 (N.Y.Sup.Ct. 1951)). We conclude that BDO has sufficiently alleged conduct on the part of the Odyssey investors to support a claim for negligent misrepresentation. We conclude also that the claim satisfies the pleading requirement of Rule 9(b).

Reliance is pleaded with sufficient particularity as well. BDO alleges that the Odyssey Investors caused BDO to rely on their silence, or tacit approval, at the meetings where Leslie Fay's financial performance was discussed, in order to render BDO's unqualified audit reports in connection with Leslie Fay's 1990 and 1991 financial statements as well as the June 1991 public stock offering.

 Finally, privity has been sufficiently pleaded as to each TPD. To the extent that specific contractual privity may have been lacking, BDO has alleged sufficient facts to justify imposition of a duty to disclose which is the practical equivalent of privity. BDO alleges that it relied on statements made by TPDs (or on their silence) as to the accuracy of information given to BDO.

## D. Division Presidents

The Division Presidents add that BDO's claim for negligent misrepresentation must be dismissed against them. The Division Presidents argue that BDO fails to allege that they made any kind of statement on which BDO could have relied. We must accept factual allegations as true on a motion to dismiss. BDO alleges that the Division Presidents made certain statements in the financial reports and SEC filings and press releases. Furthermore, BDO alleges that the Division Presidents "negligently misrepresented and concealed the true facts from BDO by ... participating in Board meetings and Audit Committee meetings with BDO at which the 1990 and 1991 financial statements were discussed.... [They] knowingly or negligently participated in providing false

and misleading information to BDO...." DP–TPC ¶ 241.

In addition, the Division Presidents argue that BDO has failed to allege privity. Indeed, a claim for negligent misrepresentation will fail, unless the complaint "set[s] forth either a relationship of contractual privity ... or a relationship sufficiently intimate to be equated with privity." *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 437, 483 N.E.2d 110, 112 (1985); *see also Ossining Union Free School Dist. v. Anderson,* 73 N.Y.2d 417, 541 N.Y.S.2d 335, 338, 539 N.E.2d 91, 94 (1989) ("[R]ecovery may be had for pecuniary loss arising from negligent representations where there is actual privity of contract or a relationship so close as to approach that of privity"). New York courts have, on numerous occasions, imposed liability for negligent misrepresentation absent formal contractual privity. The courts have only found liability in the absence of contractual privity however, where "the plaintiff's intended reliance on the information *directly transmitted* by the [defendant] created a bond so closely approaching privity that it was, in practical effect, virtually indistinguishable therefrom." *Credit Alliance,* 493 N.Y.S.2d at 439, 483 N.E.2d at 114 (emphasis in original); *see also Mallis,* 615 F.2d at 82 (cause of action would not lie unless the misstatement was "expressed *directly,* with knowledge or notice that it [would] be acted upon" by the plaintiffs) (emphasis added). "Absent privity, New York law also required that a defendant was aware of a specific party or class of parties which intended to rely upon the defendants' statement." *Brickman v. Tyco Toys, Inc.,* 722 F.Supp. 1054, 1062 (S.D.N.Y. 1989) (citing *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977)).

■ The Division Presidents argue that BDO has failed to allege privity or any relationship resembling privity. They submit that, absent privity, a plaintiff may recover for negligent misrepresentation only where the defendant owes it a fiduciary duty. *Stewart v. Jackson & Nash,* 976 F.2d 86 (2d Cir.1992). We disagree. A fiduciary relationship may be a sufficient condition to support a claim for negligent representation absent the existence of actual privity; however, it is not a necessary condition absent the existence of actual privity. *See, e.g., St. George Seaport Associates v. CSX Realty, Inc.,* 1993 WL 16116, *4 (E.D.N.Y. Jan. 15, 1993) ("The mere fact that no fiduciary duty runs from [defendant] to [plaintiff] does not determine whether there exists a 'special relationship' between the two for purposes of a negligent misrepresentation claim. The 'special relationship' has been found to exist in various circumstances where the parties were not also in a relationship that was fiduciary in nature...."). The New York courts seem to provide an opening for relationships which are so close to privity, that it should be treated like privity. It does not follow that a fiduciary relationship is the only way to satisfy this near privity requirement. Therefore, we follow the test set forth in *Ossining* and *Credit Alliance*—i.e., that a plaintiff must allege privity or a relationship approaching so closely to privity that it should be treated like privity. *Klein v. Goetzmann,* 745 F.Supp. 107, 112 (N.D.N.Y.1990).

To the extent that actual contractual privity was lacking, BDO alleges sufficient facts to give rise to a relationship of "near privity." Generally, the issue of whether a "special relationship" exists sufficient to make out a cause of action for negligent misrepresentation should be left to the trier of fact. *AFA Protective Systems, Inc. v. American Telephone and Telegraph Co.,* 57 N.Y.2d 912, 456 N.Y.S.2d 757, 758, 442 N.E.2d 1268, 1269 (1982) (citing *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977); Restatement, Torts 2d, § 552); *Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 269 (S.D.N.Y.1992).[5]

BDO alleged that the Division Presidents participated in Board meetings and Audit

---

**5.** In *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 81 n. 12 (2d Cir.1980), the Second Circuit, undertaking to construe New York law, said: "Whether a relationship exists between the parties that will bring the negligent misrepresentation doc- trine into play ... is generally treated as a question of law for the courts." The New York Court of Appeals, however, clearly established a contrary view in *AFA Protective Systems* and its progeny.

Committee meetings at which the 1990 and 1991 financial statements were discussed, and that they participated in providing false and misleading information to BDO. DP–TPC ¶ 241. If these allegations are true, the jury would be permitted in law to find the existence of that special relationship necessary to a claim for negligent misrepresentation. *Polycast Technology Corp.*, 792 F.Supp. at 269. At this preliminary stage of the proceedings, the "special relationship" pleaded in the instant complaint is sufficient.

### E. Failure to Plead a Cause of Action

We agree with BDO's legal analysis of the applicable law regarding the viability of a negligent misrepresentation claim asserted by a successful defendant to a section 10(b) action. The problem with BDO's position is its failure to apply this position in drafting its claims. The Odyssey–TPC alleges:

> *If the allegations of the Amended Complaint are true,* then, as a direct and proximate result of the foregoing negligent acts and omissions, BDO was defrauded and deceived and has suffered damages thereby, including, but not limited to, damages to its reputation, loss of business and the cost of defending this and other matters relating to the Leslie Fay fraud.

Odyssey–TPC ¶ 235 (emphasis added).[6] BDO's claim essentially asserts that if BDO is found to have violated section 10(b), BDO may recover from TPDs. A finding that BDO violated section 10(b) destroys the premise upon which recovery for negligent misrepresentation can be found—i.e., that BDO was harmed because of TPDs' breach of a duty owed to BDO. As Odyssey points out, if the allegations of the Amended Complaint are true, BDO has violated section 10(b), and BDO's damages will be the direct and proximate result of its own violation of the federal securities laws. BDO's claim, as pleaded, defies logic and cannot be sustained. We grant leave for BDO to amend its complaint in this respect.

---

**6.** BDO's claims against the Division Presidents and Hechler contain identical language, *see* DP–

### VI. Unjust Enrichment and Mutual Mistake

BDO asserts a claim that various TPDs were unjustly enriched by profits they received from their sale of stock at artificially and fraudulently inflated prices in the June 1991 public offering and on the public market following the announcement of Leslie Fay's 1991 year end results. Odyssey–TPC ¶¶ 222–24; SM–CC ¶¶ 261, 262. In addition, BDO argues that TPDs should tender their profits as restitution to the plaintiffs (or to BDO in contribution) because there was a mutual mistake of fact in their exchange of shares—i.e., that the public information on which the parties relied was accurate, or at least honest. Both claims must be dismissed.

### A. Unjust Enrichment

■ To recover on a theory of unjust enrichment, the Second Circuit has articulated,

> a plaintiff must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff.

*Dolmetta v. Uintah Nat. Corp.*, 712 F.2d 15, 20 (2d Cir.1983).

■ Under the *Dolmetta* test, BDO's allegations fail to state a cause of action for unjust enrichment. First, BDO cannot assert a direct claim against selling TPDs for unjust enrichment because BDO does not allege that TPDs benefitted at *BDO's* expense. *See Axel Johnson, Inc. v. Arthur Andersen & Co.*, 830 F.Supp. 204, 211 (S.D.N.Y.1993) (accountant being sued for section 10(b) violation could not claim contribution under theory of unjust enrichment from officers who sold stock to plaintiff).

■ Second, BDO cannot assert a contribution claim for unjust enrichment. As discussed above, BDO may claim contribution under section 10(b) from "joint tortfeasors." The definition of "joint tortfeasors" includes tortfeasors acting independently so long as they were acting concurrently and caused the

TPC ¶ 243; SM–CC ¶ 253, and therefore suffer the same infirmity.

same harm. In order for BDO to assert a claim for contribution under section 10(b), the alleged joint tortfeasor must similarly defraud plaintiffs. *Tucker*, 646 F.2d at 727 n. 7. A claim for contribution under the theory of unjust enrichment is beyond the scope of liability of a joint tortfeasor under section 10(b). BDO can identify, and we are aware of, no case which has recognized a claim for contribution under the theory of unjust enrichment for violation of section 10(b). The only case to have addressed this precise issue, *Axel Johnson*, 830 F.Supp. at 211, dismissed a contribution claim under the theory of unjust enrichment based on facts virtually identical to the facts here. We agree with that decision.

### B. Mutual Mistake

■ For similar reasons, BDO's claim for restitution under the theory of mutual mistake must be dismissed. BDO argues that, under the common law doctrine of mutual mistake of fact, because the parties were mistaken as to a basic assumption of material fact regarding the goods sold (i.e., the Leslie Fay stock), the sale should be annulled, and TPDs should be required to disgorge their profits.

Application of the doctrine of mutual mistake is illogical in the instant case, and would give rise to far-reaching undesirable implications. Even assuming that this doctrine can be applied to a sale of securities, the "mutual mistake" must be as to the very nature of the subject sold—for example, where what both parties believed to be a barren cow turns out to be with calf. *Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887). The parties here, however, were not mistaken as to the subject of their exchange (stock in Leslie Fay). They were only mistaken as to the proper valuation of the securities. Mutual mistake in *valuation* does not warrant restitution.

If we were to adopt BDO's analysis, such reasoning would apply to everyone who sold stock during the Class Period. Not only would TPDs have to disgorge their profits, but everyone who sold stock during the Class Period, including those who were not in-

volved in the alleged fraud, would be required to disgorge their profits.

Taking BDO's argument to its logical conclusion, whenever there is a sale of securities from one investor to another, if it turns out that a basic assumption on which the parties relied—i.e., that publicly available financial information was accurately reported—turns out to be false, there would be a ground for restitution. Any restatement of earnings, for example, would give rise to BDO's claim for mutual mistake. We conclude that the claim of restitution under the theory of mutual mistake must be dismissed.

### VII. Request to Replead

With respect to Rule 15(a), the Supreme Court has stated that "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). When the proposed amendments would be futile, however, a district court may deny leave to replead. *Albany Ins. Co. v. Esses*, 831 F.2d 41, 45 (2d Cir.1987). We dismiss with prejudice BDO's claims for (1) contribution under section 12, (2) disgorgement under the theory of unjust enrichment and (3) restitution under the doctrine of mutual mistake, because any amended pleading as to these claims would be futile. We dismiss BDO's claim for negligent misrepresentation, however, with leave to replead pursuant to Rule 15(a).

### CONCLUSION

For the foregoing reasons,

1) Senior Management's and Polishan's motions to dismiss BDO's cross-claims for unjust enrichment and mutual mistake (SM–CC, Counts VI and VII) are granted;

2) Odyssey's motion to dismiss BDO's third-party claims (a) for contribution under sections 10(b) and 20(a) (Odyssey–TPC, Counts I–IV) is denied, (b) for contribution under section 12, and for unjust en-

richment and mutual mistake (Odyssey–TPC, Counts V–VII) is granted, and (c) for negligent misrepresentation (Odyssey–TPC, Count VIII) is granted with leave to replead;

3) The Division Presidents' motion to dismiss BDO's third-party claims (a) for contribution under section 10(b) (DP–TPC, Counts I–III) is denied, and (b) for negligent misrepresentation (DP–TPC, Count IV) is granted with leave to replead;

4) Hechler's motion to dismiss BDO's cross-claims (a) for contribution under sections 10(b) and 20(a) (SM–CC, Counts II and V) is denied, (b) for negligent misrepresentation (SM–CC, Count IV) granted with leave to replead, and (c) for unjust enrichment and mutual mistake (SM–CC, Counts VI and VII) is granted.

SO ORDERED.